[Cite as *State v. Harris*, 2024-Ohio-2709.]

## COURT OF APPEALS OF OHIO

### EIGHTH APPELLATE DISTRICT
### COUNTY OF CUYAHOGA

STATE OF OHIO,                           :

    Plaintiff-Appellee,          :

                               No. 113364

    v.                           :

ASHLEY DAVIS HARRIS,                     :

    Defendant-Appellant.         :

---

### JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** July 18, 2024

---

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-22-675513-A

---

### *Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Anna Faraglia, Assistant Prosecuting Attorney, *for appellee*.

The Law Office of Schlachet & Levy and Eric M. Levy, *for appellant*.

MARY EILEEN KILBANE, J.:

{¶ 1} Defendant-appellant Ashley Harris ("Harris") appeals her convictions in this case. For the following reasons, we affirm.

**Factual and Procedural History**

{¶ 2} This matter stems from the fatal shooting of Shaterrica Davis ("Davis") on September 27, 2022, at the North Randall Apartments ("North Randall Apartments" or "the apartment complex") in North Randall, Ohio.

{¶ 3} On September 27, 2022, Davis and Darnesha Embry ("Embry"), who were in a relationship, spent several hours at a local lounge where Embry became very intoxicated and the women argued. As the women drove to Davis's apartment complex, where Embry had moved into Davis's apartment about one month prior, Embry called numerous friends, including Harris — Embry's former girlfriend — and asked them to come and pick Embry up. Davis called Embry's best friend, Shyonna Williams ("Williams") and asked her to help with Embry.

{¶ 4} At the apartment complex, Embry's vehicle was backed into a parking space, with the rear of the car facing a wall. Davis parked her car perpendicular to the front of Embry's vehicle, which was already parked in the lot, so that Embry could not leave the apartment complex in her vehicle. The women moved from Davis's car to Embry's vehicle and argued loudly, resulting in the police being called to the apartment complex. The police arrived around 10:00 p.m., spoke briefly with Embry and Davis, and left the apartment complex.

{¶ 5} Shortly after the police departed, Williams drove into the parking lot in her gray SUV, and Harris entered the parking lot driving her dark blue Kia Sorrento. Khamante Turpin-Marshall ("Khamante"), Harris's 19-year-old godson,

was a passenger in Harris's vehicle.  Williams parked in front of Davis's vehicle, and Harris parked behind Davis's vehicle.

**{¶ 6}** The North Randall Police Department received phone calls at approximately 10:20 p.m. stating gunshots were fired at the North Randall Apartments.  Upon arrival at the apartment complex's parking lot, the police found Davis slumped on the ground next to the driver's side of her vehicle with a fatal gunshot wound to the right side of her head.  Embry, Williams, Harris, and Khamante were not present when the police arrived and discovered Davis's body, but the North Randall police determined through their investigation that these individuals were present at the time of Davis's shooting.

**{¶ 7}** On November 14, 2022, in Cuyahoga C.P. No. CR-22-675513, a Cuyahoga County Grand Jury indicted Harris on five counts:  Count 1, aggravated murder, in violation of R.C. 2903.01(A), Count 2, murder, in violation of R.C. 2903.02(A), Count 3, murder, in violation of R.C. 2903.02(B), Count 4, felonious assault, in violation of R.C. 2903.11(A)(1), and Count 5, felonious assault, in violation of R.C. 2903.11(A)(2).  All counts carried one- and three-year firearm specifications.  On November 17, 2022, Harris pleaded not guilty to the indictment.

**{¶ 8}** The State also charged Embry, Khamante, and Williams as codefendants in Davis's murder, and they all initially pleaded not guilty to the charges.  On October 2, 2023, the three codefendants individually withdrew their prior pleas, pleaded guilty to amended charges, and agreed to testify truthfully at Harris's trial.  Embry pleaded guilty to involuntary manslaughter and was sentenced

to 30 months in prison; Khamante pleaded guilty to tampering with evidence and was sentenced to five years of community-control sanctions; and Williams pleaded guilty to obstructing justice and was sentenced to one and one-half years of community-control sanctions.

{¶ 9} On the same date the codefendants accepted plea agreements, the jury trial against Harris commenced. Generally, the trial testimony showed that on September 27, 2022, Davis, Embry, Williams, Harris, and Khamante all met at the apartment complex. While Williams, Harris, and Khamante attempted to help Embry leave the apartment complex — in either Williams's or Harris's vehicle — a disagreement ensued over obtaining Embry's car keys from Davis. Two guns shots were fired, one in the air and one that caused the death of Davis. The four surviving individuals all provided different statements at trial — Harris claimed Khamante fired the gunshots; Williams and Khamante stated Harris fired a gunshot into the air and they assumed she also fired the fatal shot; and Embry testified that she heard the gunshots but did not see who fired them. Residents at the apartment complex also provided statements as to what they observed from their balcony windows. Below is a summary of the pertinent trial testimony.

**Harris**

{¶ 10} At trial, the State played the videotape of the North Randall Police Department's October 19, 2022 interrogation of Harris. Harris offered a number of stories as to what occurred on the date of Davis's death — September 27, 2022. Initially, Harris stated she had not had contact with Embry since April 2022. Harris

then stated that she and Khamante drove around on September 27, 2022, looking for Embry. Harris stated they drove through the parking lot at North Randall Apartments but did not see Embry and drove home. Harris next stated that when she and Khamante arrived at the apartment complex, there were three girls, including Embry, arguing in the parking lot. Harris stated that she and Khamante exited her vehicle but no one spoke with them so she and Khamante left the area.

{¶ 11} After almost an hour of questioning, Harris provided another version of what occurred. Harris stated that she and Khamante exited her car in the apartment complex parking lot where Embry, Williams, and Davis were present. Harris said she stayed near her car, Embry walked towards Harris, and Khamante approached Williams and Davis. Harris stated that Khamante attempted to obtain Embry's car keys from Davis. Harris said she overheard Davis tell Khamante to "go get your momma" to which Khamante responded "my momma dead." Harris stated that on a prior occasion Khamante had "flipped out" when someone asked how his mother died. Harris further stated that Khamante fired a warning gunshot in the air at which point Harris suggested to Embry that they leave. Harris stated that she retrieved her husband's firearm that she kept in her vehicle and then heard a second gunshot and saw Davis fall to the ground. Harris left the parking lot alone in her vehicle.

{¶ 12} Harris informed the police that she did not shoot anyone and Khamante was the shooter. Harris also stated she tried to protect Khamante and Khamante told her not to say anything about the shooting.

**Embry**

{¶ 13} Embry testified that she was in a relationship with Harris from May 2021 through August 2022; she subsequently began dating Davis and moved into Davis's apartment in September 2022. According to Embry, Harris did not know Embry was involved with Davis prior to September 27, 2022, the day of the shooting.

{¶ 14} Embry testified that around 4:00 p.m. on September 27, 2022, she and Davis went to the Victory Lounge where Embry became very intoxicated. Embry stated that while at the bar, she argued with Harris via text, and Embry and Davis announced, via a live broadcast on Instagram, they were dating. Embry also stated that she and Davis argued at the Victory Lounge and while driving to the North Randall Apartments, Embry called several people, including Williams and Harris, asking them to pick her up from the apartment building.

{¶ 15} Embry testified that upon arrival at the apartment building, she and Davis moved to Embry's vehicle. While seated in Embry's vehicle, the police arrived due to the women's verbal argument, and after a short exchange the police departed without incident. Embry stated that Davis secured Embry's car keys, purse, and telephone to prevent Embry from driving in an intoxicated state.

{¶ 16} Embry also stated she fell asleep in the driver's seat of her vehicle while waiting for Williams to come to the apartment building to pick her up. Embry stated that she awoke to Williams pulling on her arm with Khamante also present. Embry testified that she exited her vehicle and as she walked towards Williams's gray car — parked to the side of Davis's vehicle — Embry saw Harris shouting at

Davis in an attempt to gain possession of Embry's car keys. Embry testified that she walked towards Harris's blue car — parked behind Davis's vehicle — and asked Harris why she was at the apartments, but Harris ignored Embry and spoke directly with Davis.

{¶ 17} According to Embry, she then followed Williams's instructions and walked towards Williams's car; Embry heard a gunshot but did not see who fired the gun. Embry stated that she entered Williams's vehicle and heard a second gunshot although she did not see who held the firearm. Embry testified that Williams and Khamante joined her in Williams's car and informed her that Davis was shot. Embry testified that she began to scream and tried to return to see Davis, but Williams refused to allow her to do so. Embry stated that for reasons unknown to her, Williams drove Khamante to Harris's home and dropped Embry at the home of Nicole Yarber ("Yarber"), Harris's mother. Embry testified that no one called the police that evening.

{¶ 18} Embry also testified that she did not see Harris, Williams, or Khamante in possession of a firearm on the night of the shooting. Embry further stated that Harris carried a firearm and had a concealed carry weapon permit.

{¶ 19} Embry testified that she stayed with Yarber for several days and during that time, Embry did not contact Harris but she spoke twice with Williams. Embry stated that Davis's family, via social media, threatened to harm her and, therefore, Embry had her brother drive her home to Georgia. Embry stated Harris paid her brother $300 to drive her.

{¶ 20} Embry testified that she first spoke with the North Randall Police Department while she was in Georgia, and she provided her first written statement to the Georgia police on October 3, 2022. Embry's written statement indicated she was so intoxicated on September 27, 2022, that she could not remember the details of the evening. Embry testified that as the trial date approached, she remembered the incident in greater detail and was offered a plea agreement.

**Khamante**

{¶ 21} In June 2022, upon the death of his mother, Khamante moved in with Harris whom he referred to as his "auntie." Khamante admitted he was arrested in August 2022 for possession of guns; the guns were confiscated, and he was placed on probation. Khamante denied possessing another gun following the August 2022 incident.

{¶ 22} On September 27, 2022, Khamante helped Harris track Embry's location on his telephone because Embry was intoxicated and needed a ride. Khamante testified that he and Harris drove to Williams's home where they learned that Embry was out drinking. According to Khamante, he and Harris drove around the local bars looking for Embry, and eventually ended up at the North Randall Apartments.

{¶ 23} Khamante testified that at the apartment complex they found Embry and Davis loudly fighting in Embry's vehicle. According to Khamante, Harris remained in her vehicle, and Khamante approached Embry's car at the same time as Williams. Khamante stated that Williams unsuccessfully attempted to remove

Embry from her vehicle. Khamante further stated that Harris then approached Embry's vehicle and she, along with Williams, removed Embry from the vehicle, and the women all walked towards Harris's vehicle.

{¶ 24} Khamante testified that as he stood near the driver's side of Davis's vehicle he asked Davis for Embry's car keys. He stated that Davis refused to provide the car keys before Embry returned Davis's telephone; Khamante went to Harris and Embry and relayed this information. Khamante stated that he turned and saw Davis opening the driver's side door of her vehicle, and Khamante approached Davis and ultimately stood inside the open driver's side door of Davis's car. Khamante testified that Davis pushed the car door into him, preventing Khamante from walking away. According to Khamante, Davis stated she needed to talk with Khamante's mom; Khamante assumed Davis was referring to Harris.[1]

{¶ 25} Khamante stated that Harris — who was near the passenger headlight of Embry's car — then fired a warning gunshot into the air and walked back towards her vehicle. Khamante testified that Harris stored the gun in her vehicle, and he saw her fire the warning shot. Khamante testified that he was "chill" during his encounter with Davis, and he denied shouting while at the apartment complex.

{¶ 26} According to Khamante, Davis responded to the warning shot by stating, "They didn't stop making guns after they made yours." Tr. 777. Khamante

---

[1] Harris stated during her interview that on a prior occasion, Khamante "flipped out" after being asked about his mother who had died in the prior year, suggesting Khamante may have also "flipped out" when Davis asked about his mother and this caused him to fire a warning gunshot. Khamante testified he did not have any reaction to Davis's request to speak with his mother.

testified that Harris then began walking towards her car — parked behind Davis's vehicle — and Khamante asked Davis again for Embry's keys when a second gunshot was fired; Khamante observed Davis's body spin and land in a sitting position on the ground. Khamante stated he did not initially realize Davis had been shot, and he told Davis to stand up. Khamante testified he knew Davis had been shot when he noticed blood on her head. Khamante further testified that he did not see Harris shoot Davis, but he assumed she was the shooter because she was the only person possessing a firearm.

{¶ 27} Khamante stated that after the second gunshot he tried to retrieve his telephone from Harris's vehicle, but Harris would not unlock the car doors for him. Khamante testified that Embry ran over to him and directed him to Williams's car. Khamante stated he then walked to Williams's car and sat in the front seat, but he did not know how to drive her foreign car and, therefore, he moved to the back seat. Khamante testified that Williams drove from the crime scene and dropped him off at Harris's home where he turned his clothes over to Harris who was concerned there might be blood on them. Khamante stated that at the time of the shooting he wore an orange and white Comma Club hoodie, purple jeans, and Air Force One shoes.

{¶ 28} Khamante denied he had a firearm while he was at the apartment complex and denied that he yelled at Williams, "Bi*!h, you be next." Tr. 772.

{¶ 29} Khamante testified that Harris wrote him two letters while he was in jail that were dated November 19, 2022, and December 21, 2022. Khamante stated

that he did not know Harris informed the North Randall Police Department that he was the shooter until he received Harris's December 2022 letter.

**Williams**

{¶ 30} Williams testified that she did not carry firearms nor did she know Embry, her childhood friend, to carry firearms. Williams further testified that she had not met Harris or Khamante prior to the night of the shooting.

{¶ 31} Williams stated she drove her gray SUV to the Randall Park Apartments on September 27, 2022, to pick up Embry. Williams stated that upon arrival she found Embry and Davis seated in Embry's vehicle and observed Davis's vehicle parked in front of Embry's car with the front driver's side door open. Williams stated she was wearing green pants and a black hoodie with her hair in a scarf. Williams further stated that she parked her SUV to the right of Davis's vehicle.

{¶ 32} Williams testified that she pulled Embry out of her car and they stood there until Harris and Khamante arrived a few minutes later. Williams stated she remained at Embry's vehicle and Embry walked towards Harris's vehicle where Harris and Khamante attempted to put her in the back seat of Harris's vehicle. Williams testified that she and Davis initially sat inside Embry's car and could not hear any conversation between Embry, Harris, and Khamante, although she heard them yelling at each other. Per Williams, Davis and Williams decided to let Harris and Khamante leave the apartment complex with Embry. Williams stated that as she and Davis walked from Embry's vehicle towards their respective vehicles, Harris approached them slapping a gun against the side of her leg and asking Davis for

Embry's car keys; Embry and Khamante began to walk from Harris's vehicle towards Williams and Davis. Williams stated that when Davis refused to provide the keys before obtaining her telephone from Embry, Harris fired a warning shot in the air and said, "[S]ay that one more time." Tr. 808. Upon hearing the warning shot, Williams ran to her car and crouched down on the passenger side of her vehicle, leaving Harris, Davis, Embry, and Khamante all standing at the driver's side of Davis's vehicle.

{¶ 33} Williams testified that approximately five seconds later a second gunshot was fired. Williams stated that Embry then ran towards her and said "Ashley, what did you just do" or "Ashley, please stop for me." Tr. 811, 819. Williams further stated that Khamante jumped in the driver's seat of her car; Harris stated, "just take that bi*!h"; and Williams walked to the driver's side of her vehicle where Khamante said to her, "Get in the car before you next." Tr. 811. Williams stated she was frightened by Khamante's aggressive yelling that suggested he carried a firearm. Williams stated she did not call 911 following the shooting but at Khamante's and Embry's direction she drove Khamante to a gas station and Embry to Yarber's home.

{¶ 34} Williams testified that she saw only Harris in possession of a firearm.

**Khristopher Wilson ("Wilson")**

{¶ 35} On the day of the shooting, Wilson resided with his friend, Andrew McGrew ("McGrew"), in a second-floor apartment at the Randall Park Apartments. Wilson testified that both men heard a gunshot outside, they turned out the lights, and looked outside. Wilson stated he "peeked out" the window and observed (1) two

cars in the parking lot running with their lights on — a red car and a gray or darker-colored sedan, (2) a male wearing a navy and orange hoodie, (3) a long-haired female dressed in green and wearing black leggings, (4) a stronger, more masculine individual whom he thought was a female, and (5) another female.

{¶ 36} Wilson testified that the male circled Davis's vehicle and the more "masculine female" dressed in a black hoodie entered the gray vehicle. Wilson testified that he then heard shouting and yelling by the male with a deep voice, followed by a second gunshot and a "faint scream." Wilson further stated:

> [W]hen the guy was shouting, when they were kind of shouting I thought I heard him saying, "Get in the car. I'm not about to drive. I just shot this b*!ch up," or something. Excuse [my] language. But that's what I believe that I heard.

Tr. 454.

{¶ 37} Wilson further testified that the female dressed in green and the male entered the car where the "masculine female" was seated, and drove off. Wilson stated he proceeded to the parking lot and observed Davis, on the ground and bleeding; Wilson remained there until the police arrived. Wilson stated he was not able to identify the facial features of any of the individuals he observed that evening.

**Andrew McGrew ("McGrew")**

{¶ 38} McGrew testified that on the night of the shooting he heard arguing, for more than ten minutes, from outside his balcony window, but when he looked outside the window, he did not see anyone. McGrew testified that he then heard a gunshot and again looked out the balcony window and "saw what looked to be a

male walking across, behind the parked cars, just approaching the vertical parked car. I saw what looked to be a female. I'm not sure." Tr. 468-469. McGrew further testified that he "peeked out" the apartment window for about two seconds before a second gunshot was fired.

{¶ 39} McGrew testified that following the second gunshot, Wilson approached the window where Wilson remained "for a long time." Tr. 472. McGrew also said he pulled Wilson aside because he did not think it was safe for Wilson to stand in front of the window.

{¶ 40} McGrew testified that he did not see anyone's faces or defining features; he quickly stopped looking after the second shot was fired; and he did not know who fired the gunshots. McGrew called 911 to the crime scene.

**Patrolman Freeman Mays ("Patrolman Mays")**

{¶ 41} Patrolman Mays testified that on September 27, 2022, he and Patrolman Shamblin reported to the North Randall Apartments due to complaints about a disturbance in the parking lot. Patrolman Mays stated that the officers spoke with Davis and Embry, who were seated in Embry's vehicle, and then left the parking lot. Patrolman Mays testified that he returned to the apartment complex about ten minutes later due to a reported shooting. Patrolman Mays stated that upon returning to the apartment complex, he discovered Davis's and Embry's vehicles in the same positions as before although Davis's vehicle was now running and the front driver's side door was wide open. Patrolman Mays also stated he observed Davis's body slumped on the ground on the driver's side of her vehicle.

{¶ 42} On cross-examination, Patrolman Mays reviewed his report, which was prepared following his investigation, and testified that Wilson and McGrew heard Davis outside their balcony arguing with a black male and the witnesses described the male as approximately five feet eleven inches, slim build, darker-skinned with a short haircut, and wearing an orange and blue hoodie and blue jeans. Patrolman Mays stated that the men informed him they heard arguing from their apartment; exited on to their balcony; returned inside their apartment; and then heard a pop. Patrolman Mays further testified that the witnesses told him they observed from their apartment window an unknown male standing over Davis, with a firearm in his hand, and "as they was getting ready to walk off, they turned back around and fired a shot in the direction where Ms. Davis was sitting, slumped against the wheel." Tr. 381. Patrolman Mays confirmed that his report indicated the black male then grabbed Embry and pulled her towards the gray SUV.

**Patrolman Steve Shamblin ("Patrolman Shamblin")**

{¶ 43} Patrolman Shamblin testified that he interviewed a female resident at the apartment complex who heard two gunshots and then looked out her second-floor balcony window. Patrolman Shamblin testified that the female resident stated she saw Embry dragged towards and placed into the front seat of the gray SUV that was parked in front of Davis's vehicle. Patrolman Shamblin further testified that the witness stated she observed a female pick up something from the ground; heard the woman state, "I got the casing. Let's go."; and saw that individual enter the gray SUV. Tr. 425.

{¶ 44} Patrolman Shamblin testified that while the female witness opined that the woman with the casing entered the gray SUV, he learned through further investigations that the woman who picked up the casing entered the black SUV. Patrolman Shamblin also stated one shell casing was recovered from the crime scene.

**Detective-Sergeant Melvin Stitt ("Stitt")**

{¶ 45} Stitt, with the North Randall Police Department, testified to the investigation into Davis's death. Stitt testified that on the day after Davis's fatal shooting, the police department received an anonymous tip that a dark-blue Kia Sorrento involved in the shooting was located at Harris's home address in Garfield Heights, Ohio. Stitt further stated that Harris and Yarber were questioned on that day, and Harris denied seeing or speaking with Embry since April 2022, but provided contact information for Embry.

{¶ 46} According to Stitt, on October 3, 2022, Embry informed the North Randall Police Department that she was in Georgia; Embry subsequently provided a written statement to the local Georgia police indicating Embry, Harris, and Williams were at the North Randall Apartments on the night of Davis's shooting. Stitt testified that arrest warrants for Harris, Embry, and Williams were issued following Embry's Georgia statement. Stitt stated that on October 19, 2022, Harris was questioned, and she identified Khamante as Davis's shooter. Stitt testified that he did not fully accept Harris's allegations but Khamante became a person of interest based upon her statements.

{¶ 47} In November 2022, the police department recovered two firearms potentially related to Davis's shooting — a Smith & Wesson 9 mm that belonged to Harris and a Taurus 9 mm recovered from Harris's ex-husband's vehicle, the same vehicle Harris drove on September 27, 2022. The firearms were submitted for analysis that showed neither fired the fatal shot.

{¶ 48} Stitt stated that Williams accepted a proffer from the prosecutor's office and she provided an interview to his department in June 2023. Stitt further stated that Khamante and Embry also accepted proffers and submitted to police interviews. According to Stitt, none of the three witnesses identified Khamante as the shooter. Stitt testified that the various stories presented by Harris, Khamante, Embry, and Williams appeared to be filled with half-truths, and some of the facts correlated while others did not.

**Michael Roberts ("Roberts")**

{¶ 49} Roberts, a forensic scientist with the Ohio Bureau of Criminal Investigation, testified that two guns obtained from Harris and Yarrow were excluded as the source of the spent cartridge recovered at the crime scene.

**Dr. David Dolinak ("Dr. Dolinak")**

{¶ 50} Dr. Dolinak, with the Cuyahoga County Medical Examiner, testified that he conducted Davis's autopsy. Dr. Dolinak observed a single fatal gunshot wound that entered the right side of Davis's head, just above her eyebrow, and exited on the left side of her head. Based upon the lack of gun powder, stippling, or muzzle

imprint, Dr. Dolinak testified that the gun was most likely fired at least two to three feet from Davis's body.

**Jailhouse Letters**

{¶ 51} Harris sent two letters — dated November 19, 2022, and December 21, 2022 — to Khamante while they were both in jail, and those letters were introduced as exhibits at trial. The December 2022 letter included the following statements:

> I'm gone [sic] get this off my chest and leave it alone after this. . . . I'm so sorry [Khamante], I'm just gone [sic] get it out. When they questioned me[,] I lied and said it was you that shot her because that[']s what the det[ective] told me to say. At first[,] I told them you rode with me because it was night time [sic] and you always went places with me and they didn't like that answer so I told them whatever I could to get away from them and I said what he told me to say . . . All is gone [sic] be well don't be scared or worried and if they question you again tell them the truth, that you rode with me to get Darnesha and then rode with them to get your b*!ch and come home. . . . I love you so much handsome this sh*t been eating me up not being able to tell you about my lie of a statement they got from me. . . .

{¶ 52} At the close of the State's case and upon the defense resting, Harris presented Crim.R. 29 motions that the trial court denied. Harris requested an inferior offense jury instruction on voluntary manslaughter that the trial court denied, and Harris objected to this on the record. The trial court instructed the jury to consider the codefendants' testimony with grave suspicion.

{¶ 53} The jury returned a verdict of not guilty on Count 1, aggravated murder and guilty verdicts on Count 2, murder in violation of R.C. 2903.02(A); Count 3, murder, in violation of R.C. 2903.02(B); Count 4, felonious assault, in

violation of R.C. 2903.11(A)(1); and Count 5, felonious assault, in violation of R.C. 2903.11(A)(2), with Counts 2, 3, 4, and 5 each carrying one- and three-year firearms specifications.

{¶ 54} For sentencing purposes, Counts 2, 3, 4, and 5 merged, and the State elected to proceed with sentencing on Count 2. The firearm specification on Counts 3, 4, and 5 also merged. On October 16, 2023, the trial court sentenced Harris to a life sentence with eligibility for parole after 15 years. The court also ordered Harris to serve the three-year firearm specifications on Counts 2 and 3 prior to and consecutive to the life sentence and consecutive to each other, resulting in a life sentence without the possibility of parole until after 21 years.

{¶ 55} On November 14, 2023, Harris filed a timely notice of appeal. She raises three assignments of error for our review:

> Assignment of Error I: Harris was convicted on all counts absent sufficient evidence.
>
> Assignment of Error II: Harris' convictions must be vacated where she was convicted against the manifest weight of the evidence.
>
> Assignment of Error III: Harris' convictions must be vacated where the trial court did not instruct on voluntary manslaughter.

**Legal Analysis**

{¶ 56} Initially, we note that in her first two assignments of error, Harris challenges the sufficiency of the evidence and the weight of the evidence supporting her convictions in Counts 2 through 5. For sentencing purposes, Counts 2, 3, 4, and 5 merged, and the State elected to proceed with sentencing on Count 2, murder, in

violation of R.C. 2903.02(A). This court has previously found that with merged offenses, if there is sufficient evidence to support the offense on which the State elected to have the defendant sentenced, the reviewing court need not consider the sufficiency of the evidence or manifest weight of the evidence on the merged counts because any error would constitute harmless error. *State v. Ramos*, 2016-Ohio-7685, ¶ 14 (8th Dist.), citing *State v. Powell*, 49 Ohio St.3d 255, 263 (1990), and *Ramos* at ¶ 15, citing *State v. Worley*, 2016-Ohio-2722, ¶ 23 (8th Dist.). Thus, pursuant to *Ramos*, we will only consider Count 2, murder, in our evaluation of the sufficiency of the evidence and the manifest weight of the evidence arguments.

**Sufficiency of the Evidence**

{¶ 57} In her first assignment of error, Harris argues there was insufficient evidence to find her guilty of murder where independent witnesses stated the person in an orange hoodie — Khamante — fired the fatal shot and the witnesses heard the male state he had just shot the victim. Further, Harris argues the codefendants' testimony was biased; no one testified that they saw Harris shoot Davis; and the jailhouse letters were "merely filler" that reflect Harris's apology for identifying Khamante as the shooter but do not show Harris lied when she identified Khamante as the shooter.

{¶ 58} Where a party challenges the sufficiency of the evidence supporting a conviction, a determination of whether the State has met its burden of production at trial is conducted. *State v. Hunter*, 2006-Ohio-20, ¶ 41 (8th Dist.), citing *State v. Thompkins*, 78 Ohio St.3d 380, 390 (1997). An appellate court reviewing sufficiency

of the evidence must determine "'whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.'" *State v. Leonard*, 2004-Ohio-6235, ¶ 77, quoting *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus. With a sufficiency inquiry, an appellate court does not review whether the State's evidence is to be believed but whether, if believed, the evidence admitted at trial supported the conviction. *State v. Starks*, 2009-Ohio-3375, ¶ 25 (8th Dist.), citing *Thompkins* at 387. A sufficiency of the evidence argument is not a factual determination, but a question of law. *Id.*

{¶ 59} To prove murder in violation of R.C. 2903.02(A), the State must prove beyond a reasonable doubt that

> [n]o person shall purposely cause the death of another or the unlawful termination of another's pregnancy.

{¶ 60} The defense relies heavily on the testimony of independent witnesses. Wilson and McGrew testified as to their observations from two floors above the parking lot through their balcony window. Tr. 443. Wilson stated he "peeked out" the balcony window and observed two cars — a gray and a red vehicle — and four individuals. Upon refreshing his memory with his September 27, 2022 written statement, Wilson testified that after he heard the first gunshot, he observed the male in an orange and navy hoodie — presumably Khamante — who appeared excited or frustrated. Wilson stated that he saw the individual circling the red vehicle, and he then heard the male shouting. Wilson stated he thought he heard

the male shout, "Get in the car. I'm not about to drive. I just shot this b*!ch up" or something similar to that, and he then heard a faint scream. Tr. 454. Wilson never testified that he saw the male, nor any of the four individuals, holding a firearm or shooting the victim.

{¶ 61} McGrew testified that it was "pretty dark" outside when he heard yelling outside his apartment window. Tr. 466. McGrew stated that he could not decipher the comments below but heard yelling and cursing. After hearing a gunshot, McGrew peeked out the window and said he "thought [he] saw a male walking" and "what looked to be a female" walking towards the rear bumper of the red car. Tr. 469-470. McGrew admitted he feared being seen or being shot at while standing in the window. After two seconds, McGrew heard a second gunshot although he could not see who fired the gun. After a car drove off, McGrew saw a body on the ground and called 911. McGrew neither testified that he saw any firearms nor did he identify the shooter.

{¶ 62} A female witness, who was not present at trial but whose statement was recited by Patrolman Shamblin, stated she saw Embry placed in the gray SUV and a female pick up something from the ground and declare, "I got the casing. Let's go." Tr. 425.

{¶ 63} In addition to the independent witness testimony, the jury heard from the three codefendants who agreed to testify against Harris as part of their respective plea agreements. Embry heard two gunshots but denied seeing the shooter. Williams testified that Harris had a firearm and fired a warning shot in the air.

Williams did not see who fired the second gunshot but following the second gunshot, Embry rushed towards Williams and said, "Ashley, what did you just do" or "Ashley, please stop for me." Tr. 811, 819. Khamante testified that he saw Harris fire the warning gunshot, and he assumed Harris fired the fatal gunshot since no one else had a firearm. The version of events offered by Khamante and Williams also supports the conclusion that Harris stood in close proximity to Davis at the time of the fatal shot.

{¶ 64} The trial court advised the jury that the codefendants' testimony was not inadmissible due to self-interest, but such testimony should be subject to grave suspicion and weighed with great caution. The trial court also instructed the jury that they judge the credibility of the witnesses and they could believe some, all, or none of the testimony.

{¶ 65} In Harris's videotaped police interrogation, she offered four different scenarios as to what transpired on the evening of September 27, 2022, but consistently denied she shot Davis. Yet, in Harris's December 21, 2022 letter to Khamante, she admits she lied to the police when she identified Khamante as the shooter: "When they questioned me[,] I lied and said it was you that shot her because that[']s what the det[ective] told me to say." Harris's argument that the letters represent an apology for telling the truth — that Khamante shot Davis — is not credible based upon the wording of the letter.

**{¶ 66}** While the trial testimony was at times contradictory, the evidence was sufficient to establish that Harris purposefully shot Davis. Thus, Harris's first assignment of error is overruled.

**Manifest Weight of the Evidence**

**{¶ 67}** In her second assignment of error, Harris contends that the jury's verdict was against the manifest weight of the evidence. A manifest weight challenge questions the credibility of the evidence presented and examines whether the State met its burden of persuasion at trial. *State v. Whitsett*, 2014-Ohio-4933, ¶ 26 (8th Dist.), citing *Thompkins*, 78 Ohio St.3d 380 at 387; *State v. Bowden*, 2009-Ohio-3598, ¶ 13 (8th Dist.), citing *Thompkins* at 390. A reviewing court "weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Martin*, 20 Ohio App.3d 172 (1st Dist. 1983), paragraph three of the syllabus. When considering an appellant's claim that a conviction is against the manifest weight of the evidence, the court of appeals sits as a "thirteenth juror" and may disagree with the factfinder's resolution of the conflicting testimony. *Thompkins* at 387, citing *Tibbs v. Florida*, 457 U.S. 31, 42 (1982). A reversal on the basis that a verdict is against the manifest weight of the evidence is granted "only in the exceptional case in which the evidence weighs heavily against the conviction." *Martin* at paragraph three of the syllabus.

{¶ 68} Harris argues that the independent witness testimony demonstrates that Davis was shot by a male clad in an orange hoodie — Khamante — who left the crime scene in a gray SUV with Williams and Embry. Harris argues that she is entitled to a second opportunity at trial because the majority of the trial evidence showed Khamante shot Davis.

{¶ 69} As discussed above, the State presented evidence showing Harris shot Davis. Harris was at the crime scene and both Williams and Khamante testified she had a gun and fired a warning gunshot. Defense counsel thoroughly cross-examined Williams, Khamante, and all trial witnesses. The independent witnesses provided conflicting testimony. However, "'an accused is not entitled to a reversal on manifest weight grounds merely because inconsistent evidence was presented at trial.'" *State v. Taylor*, 2015-Ohio-2490, ¶ 34 (10th Dist.), quoting *State v. Rankin*, 2011-Ohio-5131, ¶ 29 (10th Dist.). "The jury, as trier of fact, may take into consideration a witness's conflicting testimony in determining her credibility and the persuasiveness of her account by either discounting or resolving the discrepancies." *Id.*

{¶ 70} After reviewing the record in this case, we cannot say this is an "exceptional case" where the trial court clearly lost its way and created such a manifest miscarriage of justice that Harris's convictions were against the manifest weight of the evidence. *Thompkins,* 78 Ohio St.3d 380 at 387. For the foregoing reasons, Harris's second assignment of error is without merit and is overruled.

**Jury Instruction**

{¶ 71} Harris argues in her third assignment of error that the trial court erred when it failed to provide a jury instruction on voluntary manslaughter. We review this assignment of error under an abuse-of-discretion standard. *State v. Ladson*, 2022-Ohio-3670, ¶ 26 (8th Dist.), citing *State v. Williams*, 2009-Ohio-2026, ¶ 50 (8th Dist.).

{¶ 72} "[A] defendant charged with murder is entitled to an instruction on voluntary manslaughter when the evidence presented at trial would reasonably support both an acquittal on the charged crime of murder and a conviction for voluntary manslaughter." *State v. Shane*, 63 Ohio St.3d 630, 632 (1992), citing *State v. Tyler*, 50 Ohio St.3d 24, 37 (1990). "The trial judge must determine whether evidence of reasonably sufficient provocation occasioned by the victim has been presented to warrant such an instruction." *Shane* at paragraph one of syllabus. To make that determination, the trial court must establish whether the terms of the voluntary manslaughter statute, R.C. 2903.03, are met. R.C. 2903.03 reads in relevant part:

> No person, while under the influence of sudden passion or in a sudden fit of rage, either of which is brought on by serious provocation occasioned by the victim that is reasonably sufficient to incite the person into using deadly force, shall knowingly cause the death of another or the unlawful termination of another's pregnancy.

{¶ 73} Harris argues that Khamante "was being smashed and trapped inside a car door and he could not get away." Appellant's brief, p. 30. Harris argues that

this action by Davis sufficiently provoked her and, therefore, Harris was justified in shooting Davis to free Khamante.

{¶ 74} The evidence reflects that Khamante remained wedged in the car door until Davis was shot. However, Khamante testified that he did not yell while at the apartment complex and he was "chill" during his encounter with Davis. Khamante denied that he and Davis fought but stated Davis pushed the car door. We disagree that this constitutes sufficient evidence to warrant a jury instruction on voluntary manslaughter. We agree with the trial court's conclusion that these actions demonstrated insufficient provocation for purposes of R.C. 2903.03(A).

{¶ 75} In light of this evidence, we cannot say that the trial court abused its discretion when it denied Harris's request to issue a jury instruction on voluntary manslaughter. Thus, Harris's third assignment of error is overruled.

{¶ 76} Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
MARY EILEEN KILBANE, JUDGE

EILEEN A. GALLAGHER, P.J., and
EMANUELLA D. GROVES, J., CONCUR