[Cite as *State v. Scott*, 2024-Ohio-5849.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
ERIE COUNTY

| | |
|---|---|
| State of Ohio | Court of Appeals No.   E-23-013 |
| | E-23-014 |
| Appellee | E-23-015 |
| | |
| v. | Trial Court No.  2020 CR 0124 |
| | 2021 CR 0024 |
| Tierace Scott | 2021 CR 0094 |
| | |
| Appellant | **DECISION AND JUDGMENT** |
| | |
| | Decided:  December 13, 2024 |

* * * * *

Kevin J. Baxter, Erie County Prosecuting Attorney, and
Kristin R. Palmer, Assistant Prosecuting Attorney, for appellee.

Peter Galyardt, for appellant.

* * * * *

**OSOWIK, J.**

**{¶ 1}** In this consolidated appeal, appellant, Tierace Scott, appeals his sentences

and convictions entered by the Erie County Court of Common Pleas in case Nos. 2020-

CR-124, 2021-CR-24, and 2021-CR-94. For the reasons that follow, the trial court's

judgment is affirmed in part and reversed in part. Because the offenses of disrupting

public services and tampering with evidence are allied offenses of similar import in case

No. 2021-CR-94, we reverse and vacate those convictions, and remand this case to the trial in order that the State may elect on which charge to proceed.

## Statement of the Case

{¶ 2} A police investigation by multiple law enforcement agencies -- which involved surveillance of appellant; two warrant searches of a residence tied to appellant; a consent search of a second residence where appellant was alleged to have lived at one time; an interaction between undercover police officers and appellant while they arrested appellant pursuant to an arrest warrant; and a warrant search of a third residence that was tied to appellant -- led to charges filed in three separate cases: 2020-CR-124, 2021-CR-24, and 2021-CR-94.

{¶ 3} In case No. 2020-CR-124, appellant was charged by indictment with eleven counts, including one count of fifth-degree felony drug trafficking (cocaine), one count of fifth-degree felony drug trafficking (fentanyl related compound), four counts of third-degree felony having a weapon under disability, four counts of fourth-degree felony receiving stolen property (firearm), and one count of first-degree misdemeanor receiving stolen property (merchandise from JC Penney).

{¶ 4} The two counts for felony drug trafficking and the count for first-degree misdemeanor receiving stolen property resulted from drugs and merchandise found during the execution of two search warrants at 306 East Strub Road. The four counts for having a weapon under a disability and the four counts of fourth-degree felony receiving

2.

stolen property resulted from four guns that were found during a consent search of 423 Jackson Street.

{¶ 5} Appellant was charged by indictment in case No. 2021-CR-24 with one count of fourth-degree felony drug trafficking (heroin) and one count of fourth-degree felony drug trafficking (fentanyl-related compound). Both counts were based on drugs that were found on a man who, upon leaving 306 Market Street with appellant, attempted to flee when undercover police came to arrest appellant pursuant to an arrest warrant. The man alleged that he purchased the drugs from appellant.

{¶ 6} In case No. 2021-CR-94, appellant was charged by indictment with one count of third-degree felony tampering with evidence, one count of fourth-degree felony disrupting public services, and fifth-degree felony vandalism. All three charges stemmed from appellant cutting off the ankle monitor that he was required to wear as a condition of his bond for case Nos. 2020-CR-124 and 2021-CR-24.

{¶ 7} The three cases were joined and resulted in a single trial. The jury found appellant guilty of all the charges, and the counts were merged for sentencing as follows. In case No. 2020-CR-124, the two counts for drug trafficking were merged, the four counts for having a weapon under disability were merged, and the four counts for felony receiving stolen property were merged. In case No. 2021-CR-24, both counts for drug trafficking were merged. And in case No. 2021-CR-94, none of the three counts relating to the ankle monitor were merged.

3.

{¶ 8} In case No. 2020-CR-124, appellant was sentenced to serve three years in prison for the merged counts of having a weapon under disability, one year for the merged counts of fifth-degree felony drug trafficking, and eighteen months for the merged counts of felony receiving stolen property. He was also sentenced to serve 180 days in jail for the single count of misdemeanor receiving stolen property.

{¶ 9} In case No. 2021-CR-24, appellant was sentenced to serve eighteen months in prison for the merged counts of fourth-degree felony drug trafficking.

{¶ 10} And in case No. 2021-CR-94, appellant was sentenced to serve three years in prison for tampering with evidence, one year for vandalism, and eighteen months for disrupting public services.

{¶ 11} All but the one year that was imposed for vandalism and the eighteen months that were imposed for disrupting public services were ordered to be served consecutively, for an aggregate prison term of ten years.

{¶ 12} Appellant timely filed an appeal for each case, and this court consolidated the three appellate cases into case No. E-23-013.

**Statement of the Facts**

**Case No. 2020-CR-0124**

1) **306 East Strub Road – Evidence of Drug Trafficking, Cocaine and Fentanyl-Related Compound**

{¶ 13} On July 5, 2019, Detectives Rotuno and Alexander conducted surveillance at 306 East Strub Road after receiving information about possible drug trafficking.

4.

Detective Rotuno testified that he learned from the Alert database that appellant and his girlfriend, Qiana Kaczkas, resided at that location.

{¶ 14} Detective Rotuno observed Joshua Veliz, who he knew had multiple arrest warrants, arrive at the East Strub residence. He then observed appellant, Beliz, and Thomas Harston leave the residence in Veliz's vehicle. Detectives Rotuno and Alexander followed the vehicle and initiated a traffic stop. A search of Veliz's vehicle uncovered a number of items that Veliz admitted had been stolen from JC Penney as well as drug paraphernalia, marijuana, and a spoon with residue – all of which Veliz admitted were his.

{¶ 15} On July 12, 2019, Detective Rotuno returned to 306 East Strub Road to execute a search warrant for stolen property. Detective Rotuno testified that the home was in "heavy disarray" and that he considered it to be a "flophouse" used for criminal activity. During the investigation, he learned that Dolanda Kaczka, the sister of appellant's girlfriend, was the primary tenant of the residence. Dolanda testified that her sister and appellant had lived with her at the house on East Strub Road in 2019.

{¶ 16} Detective Rotuno noted that appellant had been associated with at least six different addresses over a two or three-year period. Detective Rotuno testified that, based on his training and experience, drug dealers often move between transient housing to avoid detection.

{¶ 17} During the search of the East Strub residence, police seized evidence of stolen air conditioners, a stolen Bluetooth soundbar, two stolen televisions, and a security

5.

sensor. Because police also uncovered items that suggested potential drug trafficking, Detective Rotuno stopped the search and obtained a second search warrant to look for items related to drug possession and trafficking. Related to the second search, police uncovered a grinder with white powder residue in the kitchen and a box of sandwich bags and plastic baggie containing a white powder substance in a backpack in Bedroom 1. BCI tested the plastic baggie containing the white powder and determined that it weighed approximately 59.98 grams but did not contain any controlled substances. Detective Rotuno testified that the tested substance would be used as a cutting agent. BCI also tested the residue found on the grinder and determined that it contained a trace amount of cocaine and carfentanil, both controlled substances. Detective Rotuno and Officer Cook testified that these items are associated with drug trafficking. Detective Rotuno also testified that he believed appellant and Quana Kaczkas were using Bedroom 1 based on mail and clothing that were found in that bedroom.

{¶ 18} During a phone call with Detective Rotuno in December 2019, appellant stated that his wallet was in the same backpack in which the sandwich baggies and cutting agent were found. That backpack was also found to contain mail with appellant's name on it.

2) **423 Jackson Street – Evidence of Stolen Firearms**

{¶ 19} Following the searches of 306 East Strub Road, Detective Rotuno went to 423 Jackson Street -- which was the home of Sally Kaczka, the grandmother of appellant's girlfriend -- to continue his investigation of the stolen clothes. Sally Kaczka

6.

testified that appellant and Qiana Kaczka used to live with her at that address. With Sally's permission, Detective Rotuno and his partner, Detective Alexander, entered a room that Sally identified as the room that appellant and Qiana had previously occupied. The room was empty of furniture, but sitting in the middle of the room was a large bag full of what Detective Rotuno suspected were stolen clothes. Sally asked the officers to take the clothes, which she confirmed were stolen, as well as some guns that were located in a space above the closet in the same bedroom. According to Sally, appellant had brought the guns into the residence and put them into that space. The guns, four in total, were wrapped up together in dirt-and-leaf covered plastic and cloth.

{¶ 20} Detective Rotuno had previously investigated the theft of multiple firearms from Gary Castle's house on Bogart Road in 2018. Detective Rotuno identified the firearms that were discovered above the closet at Sally Kaczka's residence at 423 Jackson Street to be the same ones that were stolen from the Bogart Road residence. Those firearms included: (1) a .30-06 semi-automatic rifle; (2) a Winchester .22 long rifle semi-automatic; (3) a 410 shotgun; and (4) an antique Winchester pump action rimfire rifle.

{¶ 21} Robb Parthemore, the retired chief of police for the Perkins Police Department, testified about his extensive experience and training with respect to firearms. He testified that all four firearms in this case were in poor condition from being left out in the elements but that their poor condition did not mean that they were inoperable. Because the bore of each gun did not "look as good as it should," Parthemore cleaned them before testing them, for his own safety. To clean the bores, Parthemore treated them

7.

with Hoppes solvent, let them sit for a couple of days, and then swabbed them out. Thereafter, he successfully test-fired -- and thereby found to be operable -- all of the guns except the antique rifle, which he considered unsafe to load due to rust buildup that was "gumming up" the tubular magazine.

{¶ 22} Parthemore testified that the "gunk" that was in the antique firearm did not necessarily render it inoperable and that to enable it to fire one needed only to insert a round directly into the chamber. Although Parthemore had considered inserting a round into the chamber of the antique gun, he ultimately determined that such would be unsafe because the particular cartridge that was required for the gun was of a type that could go off in his hand if he pinched the edge of it incorrectly while trying to insert it. In light of this safety concern, Parthemore performed a "functions check" on the gun, rather than a test fire. From the results of his functions check, Parthemore determined, based on his training and experience, that the antique gun, like the other three guns, was operable.

## Case No. 2021-CR-0024

{¶ 23} On June 18, 2020, Sergeant Scheerer and Detective Sergeant Harvey conducted surveillance on 306 Market Street after receiving information of a potential drug transaction at the residence together with information that appellant, for whom they had an arrest warrant, was staying there. Detective Sergeant Harvey observed Ronald Geffeller exit a vehicle and enter the Market Street residence through the front door. Shortly thereafter, Geffeller and appellant exited the residence together. Detective Sergeant Harvey approached appellant, informed him of indictments against him, and

8.

took him into custody. During her search of appellant's person, Detective Sergeant Harvey removed three bundles of money totaling $3,099 from appellant's pocket. Detective Sergeant Harvey and Detective Rotuno both testified that, based on their training and experience, the way the money was bundled and its denominations were indicative of drug trafficking. Detective Rotuno also testified that one of the bundles contained $850, which was an amount comparable to the price of two ounces of narcotics. Appellant offered inconsistent information to Detective Sergeant Harvey about the source of the money and its owner.

{¶ 24} While Detective Sergant Harvey was occupied with appellant, Geffeller fled on foot and was pursued by Sergeant Scheerer. Sergeant Scheerer testified that he observed Geffeller ripping open a plastic baggie and emptying a white powdery substance, which he believed to be illegal narcotics. Sergeant Scheerer eventually apprehended Geffeller and recovered the opened plastic baggie as well as another plastic baggie that was in Geffeller's pants pocket. BCI determined that the white substance in one of those baggies weighed approximately 2.75 grams and contained heroin and fentanyl, and that the residue in the other baggie also included heroin and fentanyl.

{¶ 25} On the following day, June 19, 2020, Sergeant Scheerer had another encounter with Geffeller at the Sheriff's Office, after Geffeller was released from jail. Sergeant Scheerer testified that Geffeller told him that he had been at the Market Street residence the previous day to purchase narcotics from appellant. Sergeant Scheerer also had an opportunity to look at Geffeller's cell phone, which included a text message

9.

conversation between Geffeller and "Streets." Sergeant Scheerer and Officer Cook both testified that based on prior interactions and information, they knew "Streets" to be appellant. Appellant also identified himself as "Streets" in several jail phone calls after his arrest. The contact information for "Streets" in Geffeller's phone showed a number that Sergeant Scheerer testified came back to appellant in the Alert database. Geffeller's phone showed an outgoing call to "Streets" at 1:34 p.m. on June 18, 2020 – approximately 30 minutes before Geffeller was seen with appellant at the Market Street residence. The text messages between Geffeller and appellant stated as follows:

Geffeller: I'm here.

Streets: U got the money for the 2

Geffeller: Bring 1 and a half just don't leave me empty

Geffeller: U come

Geffeller: Home

Streets: Yea crib

Geffeller: I'll bee out there

Geffeller: Have 2 more ready

{¶ 26} Also on June 19, 2020, Sergeant Scheerer and Detective Sergeant Harvey returned to 306 Market Street to execute a search warrant. During the search, law enforcement found utility bills in the name of appellant and Qiana Kaczka, a document from Fireland's Regional Medical Center in appellant's name and listing his phone number, a wallet containing appellant's identification card, a digital scale with residue, a

10.

bookbag containing money, marijuana paraphernalia, and marijuana roaches. The digital scale with residue and marijuana roaches were found in a bedroom that contained paperwork with appellant's name on it and male clothing in his size.

## Case No. 2021-CR-0094

{¶ 27} Appellant was ordered by the court to wear an ankle monitor while on house arrest as part of his bond conditions in case Nos. 2020-CR-124 and 2021-CR-24. Oriana House is a community corrections agency that provides electronic monitoring services to its customer, the Erie County Adult Probation Department. At the probation department's request, Oriana House affixed an electronic monitor to appellant's ankle on October 26, 2020. On January 27, 2021, appellant "generated a tamper alert." After twelve hours of unknown whereabouts, appellant was unsuccessfully terminated from the program for tampering with his ankle monitor and violating the program rules.

{¶ 28} Oriana House Director Tiana Krause testified that Oriana House must pay for the repair of any damaged equipment, and that having damaged equipment affects Oriana House's ability to operate its business, because damaged equipment cannot be placed on another individual.

## Sentencing

{¶ 29} As indicated above, in case No. 2020-CR-124, the two counts for drug trafficking were merged, the four counts for having a weapon under disability were merged, and the four counts for felony receiving stolen property were merged. And in case No. 2021-CR-24, both counts for drug trafficking were merged.

{¶ 30} In case No. 2021-CR-94, none of the three counts relating to the ankle monitor were merged, despite defense counsel's argument that they all should merge and the State's agreement that tampering with evidence and disrupting public services should merge.

{¶ 31} The state requested that the court impose consecutive sentences, due to appellant's criminal history, his failure to respond favorably to probation, and his failure to take responsibility for his actions.

{¶ 32} Prior to issuing appellant's sentence, the trial court stated on the record that it had taken into consideration R.C. 2929.11 sentencing guidelines and R.C. 2929.12 factors. The trial court recited appellant's lengthy criminal history, and then specified pursuant to R.C. 2929.14(C)(4)(a):

> The Court finds … that you have a history of criminal convictions, that a prison term of consecutive sentences is necessary to protect the public from future crimes by you. We've already talked about your past record and what happened here and the danger that you pose to the public being involved in the trafficking in fentanyl-related compound, having weapons, and unpredictable behavior with cutting the ankle bracelet.

> The Court also finds that you were – have a history of criminal conduct that demonstrates consecutive sentences are necessary, that a single sentence would demean the seriousness of this conduct, and that the multiple offenses were committed as a course of criminal conduct and the harm great, so great or unusual, no single prison terms would satisfy the purpose and principles of sentencing.

{¶ 33} The trial court went on to sentence appellant as indicated above. That is, in case No. 2020-CR-124, he was sentenced to serve three years in prison for the merged

12.

counts of having a weapon under disability, one year for the merged counts of fifth-degree felony drug trafficking, and 18 months for the merged counts of felony receiving stolen property. He was also sentenced to serve 180 days in jail for the single count of misdemeanor receiving stolen property.

{¶ 34} In case No. 2021-CR-24, appellant was sentenced to serve 18 months in prison for the merged counts of fourth-degree felony drug trafficking.

{¶ 35} And in case No. 2021-CR-94, appellant was sentenced to serve three years in prison for tampering with evidence, one year for vandalism, and 18 months for disrupting public services.

{¶ 36} As noted above, all but the one year that was imposed for vandalism and the 18 months that were imposed for disrupting public services were ordered to be served consecutively, for an aggregate prison term of ten years.

### Assignments of Error

{¶ 37} On appeal, appellant asserts the following assignments of error:

I.     Tierace Scott's merged weapon under disability and merged felony receiving stolen property findings of guilt are not supported by sufficient evidence, and the trial court erred when it denied his Crim.R. 29 motion as to those charges.

II.    The trial court erred and violated Tierace Scott's constitutional rights to confrontation when it admitted testimonial evidence absent the opportunity for cross examination.

13.

III. Tierace Scott's merged weapon under disability and merged felony receiving stolen property findings of guilt are not supported by the manifest weight of the evidence.

III. Tierace Scott's trial counsel rendered ineffective assistance of counsel, in violation of his constitutional rights.

IV. The trial court erred when it separately sentenced Tierace Scott for allied offenses of similar import. [Tampering with evidence, disrupting public services, and vandalism.]

V. The trial court committed plain error when it separately sentenced Tierace Scott for allied offenses of similar import. [Weapon under disability and felony receiving stolen property.]

VI. The trial court erred when it sentenced Tierace Scott to a consecutive sentence that the record clearly and convincingly does not support.

## Law and Analysis

**Appellant's convictions for having weapons under disability and receiving stolen property were supported by the weight and sufficiency of the evidence.**

{¶ 38} Appellant contends in his first assignment of error that there was insufficient evidence to support his merged convictions for having weapons under disability and for felony receiving stolen property in case No. 2020-CR-0124, because the state failed to prove that: (1) the firearms involved "were operable or capable to be readily rendered operable"; and (2) appellant knew or had reasonable cause to believe that the firearms had been obtained through the commission of a theft offense. In his third

14.

assignment of error, appellant contends that his merged convictions for having weapons under disability and felony receiving stolen property were against the manifest weight of the evidence for the same reasons. Accordingly, we will address these assignments of error together.

## Standard of Review

{¶ 39} "In reviewing a record for sufficiency, '[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.'" *State v. Jones,* 2021-Ohio-2621, ¶ 66, quoting *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus.

{¶ 40} "In contrast, when reviewing a manifest weight claim,

> '[t]he court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.

*Id.,* quoting *State v. Lang*, 2011-Ohio-4215, ¶ 220. (Additional citation omitted.)

{¶ 41} "[W]ith merged offenses, if there is sufficient evidence to support the offense on which the state elected to have the defendant sentenced, the reviewing court need not consider the sufficiency of the evidence or the manifest weight of the evidence on the merged counts because any error would constitute harmless error." *State v. Cook*,

15.

2024-Ohio-2966, ¶ 59 (5th Dist.), citing *State v. Harris*, 2024-Ohio-2709, ¶ 59 (8th Dist.). In this case, because the counts for weapons under disability were merged into Count 3 and the counts for receiving stolen property were merged into Count 7, we will consider only those two counts in our evaluation of the sufficiency of the evidence and the manifest weight of the evidence arguments. Both Count 3 and Count 7 related to the .30-06 semi-automatic rifle.

**The firearm was operable or could be readily rendered operable.**

{¶ 42} R.C. 2923.13, having weapons under disability, prohibits a person from acquiring, having, carrying or using a firearm under certain, enumerated, circumstances. And R.C. 2913.51, which prohibits the receipt of stolen property, establishes that if the property involved is a firearm or other dangerous ordnance, receiving stolen property is a felony of the fourth degree. R.C. 2913.51(C).

{¶ 43} The Ohio Revised Code defines a "firearm" as follows:

> (B)(1) "Firearm" means any deadly weapon capable of expelling or propelling one or more projectiles by the action of an explosive or combustible propellant. "Firearm" includes an unloaded firearm, and any firearm that is inoperable but that can readily be rendered operable.
>
> (2) When determining whether a firearm is capable of expelling or propelling one or more projectiles by the action of an explosive or combustible propellant, the trier of fact may rely upon circumstantial evidence, including, but not limited to, the representations and actions of the individual exercising control over the firearm.

R.C. 2923.11(B).

{¶ 44} To establish the offense of having a weapon under disability, the State must prove beyond a reasonable doubt that any gun that appellant had while under disability was operable or was capable of being readily rendered operable. *See State v. Elliott*, 2022-Ohio-3778, ¶71 (3d Dist.) (finding that prosecution had to establish beyond a reasonable doubt that any gun defendant had while under disability was operable or was capable of being rendered operable).

> 'The requirement that a gun be either operable or readily capable of being rendered operable is meant to distinguish irretrievably broken guns from guns that are either fully functioning or temporarily non-functioning.' *State v. Stubblefield,* 2008-Ohio-5348, ¶ 9 (8th Dist.). A jammed gun that is temporarily nonoperational is capable of being readily rendered operable because the jam can be cleared.

*State v. Maynard*, 2023-Ohio-4619, ¶33 (1st Dist.); *see also State v. Fluellen*, 88 Ohio App.3d 18, 24 (4th Dist. 1993) (where gun had "a half-inch dirt plug in the barrel" the gun was temporarily inoperable but was readily made operable by cleaning the dirt plug out of the barrel).

> On the other hand, a gun with excessive rusting may be inoperable. While the rust might be cleaned in such a way as to render the gun operable, the removal of the rust might be so time-consuming that the gun could not be said to be capable of being readily operable. Ultimately, whether a gun can be readily rendered operable is a question of fact. *State v. Thompkins*, 1997-Ohio-52, paragraph one of the syllabus.

*Stubblefield* at ¶9. "'In determining whether a firearm is operable, the trier of fact examines the totality of the circumstances.'" *State v. Robinson*, 2020-Ohio-6978, ¶28 (6th Dist.), quoting *State v. Johnson*, 2016-Ohio-872, ¶ 8 (9th Dist.).

17.

**{¶ 45}** Here, Robb Parthemore testified that the .30-06 semi-automatic rifle was operable. Although he stated that he cleaned the bore of the firearm before testing it, he testified that he did so for his own safety, and not because it was inoperable in its current condition.

**{¶ 46}** Parthemore successfully test fired the .30-06 semi-automatic rifle, and on that basis determined it to be operable.

**{¶ 47}** Appellant contends that Parthemore's testimony was insufficient because Parthemore's safety concerns for the weapon "went directly to operability, to wit: [Parthemore's concern that] the bullets (projectiles) would not expel or propel but instead [would] create a risk of explosion." Even if we were to accept this argument -- which seems to go to the matter of the weight of the evidence, rather than sufficiency -- it does not address or otherwise negate the suggestion that the weapon, with cleaning, was readily capable of being rendered operable.

**{¶ 48}** Accordingly, we find that the record contains ample evidence from which a rational trier of fact could conclude that the subject firearm was operable, or could readily be rendered operable, and there is no evidence that the jury clearly lost its way in convicting appellant of having a weapon while under disability and felony receiving stolen property with respect to this firearm.

18.

**Appellant knew or had reasonable cause to believe the firearm was stolen.**

{¶ 49} R.C. 2913.51(A) prohibits a person from "receiv[ing], retain[ing], or dispos[ing] of the property of another knowing or having reasonable cause to believe that the property has been obtained through the commission of a theft offense."

{¶ 50} Pursuant to R.C. 2901.22(B):

> A person acts knowingly, regardless of purpose, when the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when the person is aware that such circumstances probably exist. When knowledge of the existence of a particular fact is an element of an offense, such knowledge is established if a person subjectively believes that there is a high probability of its existence and fails to make inquiry or acts with a conscious purpose to avoid learning the fact.

> "'[O]ne has 'reasonable cause to believe' property was obtained through a theft offense when, after putting oneself in the position of this defendant, with his knowledge, lack of knowledge, and under the circumstances and conditions that surrounded him at the time, the acts and words and all the surrounding circumstances would have caused a person of ordinary prudence and care to believe that the property had been obtained through the commission of a theft offense.'"

*State v. Johnson,* 2020-Ohio-4077, ¶ 14 (10th Dist.), quoting *State v. Skinner,* 2008-Ohio-6822, ¶ 12 (10th Dist.), quoting *State v. Kirby*, 2006–Ohio–5952, ¶ 11 (10th Dist.). (Additional citation omitted.)

{¶ 51} "When determining whether a person acts knowingly, has knowledge of the circumstances, has knowledge of a particular fact, or has reasonable cause to believe the property was stolen, the trier of fact must determine the person's state of mind from the

19.

totality of the circumstances surrounding the alleged crime." *Johnson* at ¶ 15. "Absent an admission by a defendant, whether there was reasonable cause for a defendant to know if an item was stolen can only be shown by circumstantial evidence." *State v. Baldwin*, 2020-Ohio-699, ¶ 35 (6th Dist.), citing *State v. West*, 2002-Ohio-2242, ¶ 843 (8th Dist.). "It is well-established in Ohio that '[c]ircumstantial evidence and direct evidence inherently possess the same probative value." *Id.,* citing *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph one of the syllabus.

{¶ 52} "Some factors that may be helpful in determining whether a defendant knew or should have known that property has been obtained through the commission of a theft offense include: '(a) the defendant's unexplained possession of the merchandise, (b) the nature of the merchandise, (c) the frequency with which such merchandise is stolen, (d) the nature of the defendant's commercial activities, and (e) the relatively limited time between the thefts and the recovery of the merchandise.'" *Id.*, citing *State v. Davis*, 49 Ohio App.3d 109, 112 (8th Dist. 1988).

{¶ 53} Here, appellant's possession of the .30-06 semi-automatic rifle was never affirmatively explained by any witness. At the time in question, appellant was under a disability and unable to legally possess a firearm. In addition, there was testimony that the firearm was in poor condition from being kept outside in the elements. Further testimony established that appellant placed the gun -- which was wrapped together with other guns in a trash bag -- into a cubbyhole above the closet at Sally Kaczka's house. When appellant moved out of Sally Kaczka's house, he left only two things behind –

20.

stolen clothing and firearms, including the stolen .30-06 semi-automatic rifle. The jury could reasonably conclude from these facts that appellant, knowing the firearm was stolen, attempted to hide it and intentionally left it behind.

{¶ 54} The prosecution does not, as appellant claims, "demand on appeal" that appellant provide an explanation for his possession of the stolen item. Instead, the State merely points out that no explanation was ever provided.

{¶ 55} Appellant further claims that his secreting of the firearm was reasonably attributed to the fact that he was prohibited from possessing firearms, and not because the firearm was stolen. To the contrary, nothing about the evidence presented precludes a determination that appellant hid the gun because it was stolen.

{¶ 56} Based on this evidence of appellant's conduct, a rational trier of fact could infer that appellant knew or had reasonable cause to believe that the firearm had been stolen, and there is nothing to suggest that the jury clearly lost its way in convicting appellant of felony receiving stolen property.

{¶ 57} For all of the foregoing reasons, appellant's first and third assignments of error are found not well-taken.

21.

**The trial court did not violate appellant's constitutional rights to confrontation when it admitted photos of text messages between appellant and Ronald Geffeller.**

{¶ 58} Appellant argues in his second assignment of error that the trial court erred in violation of the Confrontation Clause by admitting photos of the text messages between himself and Ronald Geffeller, without the opportunity to cross-examine Geffeller.

### Confrontation Clause

{¶ 59} A criminal defendant has the right to confront witnesses under both the United States and Ohio constitutions. The Sixth Amendment to the United States Constitution states: "In all criminal prosecutions, the accused shall enjoy the right … to be confronted with the witnesses against him." Likewise, Article I, Section 10 of the Ohio Constitution states that "[i]n any trial, in any court, the party accused shall be allowed … to meet the witnesses face to face."

{¶ 60} "'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted in the statement." Evid. R. 801(C). "[W]henever the state seeks to introduce hearsay into evidence in a criminal proceeding, the court must determine not only whether the evidence fits within an exception to the hearsay rule, but also whether the introduction of such evidence offends an accused's right to confront witnesses against him." *State v. Boyce*, 2024-Ohio-464, ¶9 (8th Dist.), citing *State v. Kilbane,* 2014-Ohio-1228, ¶ 29 (8th Dist.).

22.

{¶ 61} The United States Supreme Court in *Crawford v. Washington*, 541 U.S. 36 (2004), held that the Confrontation Clause bars the admission of testimonial statements of a witness who does not appear at trial unless he is unavailable to testify and the defendant has had a prior opportunity for cross-examination. *Id.* at 53-54. "It is the testimonial character of the statement that separates it from other hearsay that, while subject to traditional limitations upon hearsay evidence, is not subject to the Confrontation clause." *Davis v. Washington*, 547 U.S. 813, 821.

{¶ 62} "Although the *Crawford* Court did not specifically define the term 'testimonial,' it explained that hearsay statements are implicated by the Confrontation Clause when they are 'made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.'" *Boyce* at ¶ 12, quoting *Crawford* at 52. As examples of testimonial statements, the court listed affidavits, custodial examinations, depositions, prior testimony, confessions, or similar pretrial statements that declarants would reasonably expect to be used in a prosecution. *Crawford* at 51-52.

{¶ 63} In *Davis,* the United States Supreme Court provided that whether a statement is testimonial depends upon the "primary purpose" of the statement. *Id.* at 822; *see also State v. Siler*, 2007-Ohio-5637, paragraph one of the syllabus; *State v. Stevenson*, 2023-Ohio-4853, ¶ 60 (6th Dist.). "Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing

23.

emergency." *Id.* "If, however 'the primary purpose of the interrogation is to establish or prove past events potentially relevant to later prosecution,' then the statements are testimonial.'" *Stevenson* at ¶ 61, quoting *State v. Ford,* 2021-Ohio-3058, ¶ 22 (6th Dist.), quoting *Davis* at ¶ 822.

{¶ 64} Appellant argues that the text messages between himself and Geffeller are "quintessential testimonial evidence" because they were discovered and obtained during a police interrogation. We disagree with this characterization of the evidence.

{¶ 65} The statements in the text messages -- although indeed revealed during police questioning -- were originally made as part of a casual, private conversation between appellant and Geffeller. They did not come within the purview of any of the classes of testimonial statements mentioned in *Crawford*, and they were not made for the purpose of establishing or proving some fact relevant to a later criminal prosecution. Thus, they were not testimonial under *Crawford* or *Davis,* and their admission did not violate appellant's right of confrontation. *See State v. Lang,* 128 So.3d 330, 340 (La.App. 5 Cir. Oct. 9, 2013) (text messages made in casual, private conversations were not testimonial); *State v. Damper,* 225 P.3d 1148 (Ariz.Ct.App.2010) (because content and circumstances of text demonstrated that the individual did not send it for the purpose of establishing or proving some fact, the message was non-testimonial); *Rodriguez v. State*, 273 P.3d 845 (Nev.2012) (text messages were neither hearsay nor testimonial).; *U.S. v. Thompson*, 568 Fed.Appx. 812 (2014) (texts deemed not testimonial where author would

24.

never have sent his incriminating messages had he anticipated their future use in a court of law).

{¶ 66} Not only were the text messages between appellant and Geffeller not testimonial, they were also not hearsay, because they were (properly authenticated) admissions by a party-opponent under Evid.R. 801(D)(2)(a). *See State v. Fitts*, 2020-Ohio-1154, ¶ 32 (6th Dist.) (text messages from defendant to confidential informant were not hearsay, because they were admissions by a party opponent under Evid.R. 801(D)(2)(1)); *State v. Roseberry*, 2011-Ohio-5921, ¶ 73 (8th Dist.) (photos of text message that defendant sent from his cell phone were not hearsay; as long as they were properly authenticated, they were the party's own statements); *see also State v. Shaw,* 2013-Ohio-5292, ¶ 43 (7th Dist.) (photographs of text messages can be admissible as an admission by a party-opponent under Evid.R. 801(D)(2)(a) if they are properly authenticated); *State v. Moorer*, 2019-Ohio-1090, ¶ 64 (7th Dist.).

{¶ 67} Appellant's objections to the contrary notwithstanding, the law is clear that "[s]tatements that are not hearsay 'do not implicate the Confrontation Clause.'" *Fitts* at ¶ 30, quoting *State v. Beasley*, 2018-Ohio-493, ¶ 171. (Additional citation omitted.) Moreover, multiple Ohio courts have concluded that "the Confrontation Clause is simply inapplicable" where, as here, "the 'witness' is the accused himself." *State v. Lloyd,* 2004-Ohio-5813, ¶ 16 *(*2d Dist.); *see also State v. Brown,* 2010-Ohio-2460, ¶ 30 (8th Dist.); *State v. Hardison,* 2007-Ohio-366, ¶ 16 (9th Dist.).

25.

{¶ 68} As the text messages in question were neither testimonial nor hearsay, their admission into evidence did not violate the Confrontation Clause. Appellant's second assignment of error is therefore found not well-taken.

**Appellant's trial counsel was not constitutionally ineffective.**

{¶ 69} Appellant argues in his fourth assignment of error that his trial counsel was constitutionally ineffective. "In general, to prevail on a claim of ineffective assistance, [an] appellant must show that counsel's conduct so undermined the proper functioning of the adversarial process that the trial court cannot be relied upon as having produced a just result." *State v. Birr,* 2011-Ohio-796, ¶ 18 (6th Dist.), citing *Strickland v. Washington*, 466 U.S. 668, 692-693 (1984). Under this standard, appellant must satisfy a two-prong test. "First, appellant must show that counsel's representation fell below an objective standard of reasonableness. Second, appellant must show a reasonable probability that, but for counsel's errors, the results of the proceeding would have been different." *Birr* at ¶ 18, citing *Strickland* at 687-688. "Reasonable probability" is "probability sufficient to undermine confidence in the outcome" of the proceedings. *Strickland* at 694.

**Weapons Under Disability and Prior Convictions**

{¶ 70} Appellant first contends that his trial counsel was ineffective for allowing the weapons under disability offenses to be tried to the jury. Pursuant to R.C. 2923.13(A)(3), the existence of appellant's prior felony drug convictions was an essential element of the weapons under disability offense. As a result, the jury was informed of those offenses at trial. According to appellant, his trial counsel was ineffective for

26.

allowing the jury to hear about these convictions rather than trying the weapons under disability offenses to the court.

{¶ 71} "It is '[a] recognized concern with trying a weapons under a disability charge to the jury [] that, in a case where a defendant does not testify, the jury would learn about a defendant's prior conviction for the sole reason that the charge was tried before them and not a judge.'" *State v. Jones*, 2011-Ohio-5966, ¶ 11 (2d Dist.), quoting *State v. Ingram,* 2007-Ohio-7136, ¶ 77 (10th Dist.). However, "trying the charge to a jury when the defendant does not testify is not per se unreasonable." *Id.* at ¶ 11, citing *Ingram* at ¶ 77. Courts have classified counsel's decision to try a weapons under disability charge to the jury as trial strategy. *State v. Feltha,* 2017-Ohio-8640, ¶ 7 (1st Dist.); *State v. Boyde*, 2013-Ohio-3795, ¶ 19 (10th Dist.); *State v. Griffin*, 2013-Ohio-416, ¶ 44 (9th Dist.); *Jones* at ¶ 11; *Ingram* at ¶ 76. Indeed, several courts have recognized that "trying the charge to a jury may be reasonable strategy in light of the fact that 'the chance of an acquittal, or even a hung jury, is considerably greater when charges are tried to a jury, rather than a judge.'" *Jones* at ¶ 11, quoting *State v. Love*, 2006-Ohio-1824, ¶ 49 (4th Dist.).

{¶ 72} In addition, several courts have rejected similar ineffective assistance of counsel claims after finding that "the right to waive jury trials belongs *not to counsel* but to [the defendant] himself" and that "[i]n the absence of any evidence that [the defendant] expressed a desire to waive his rights to a jury trial *prior to trial* [it cannot be concluded] that counsel was ineffective for failing to assert a right which did not belong to him."

27.

*State v. Rogers*, 2008-Ohio-2757, ¶ 82 (11th Dist.) (emphasis in original); *see also State v. Slaughter*, 2014-Ohio-862, ¶ 56 (2d Dist.) As in those cases, there is nothing in the record here indicating that appellant wanted to waive his right to a jury trial on the weapons under disability charges prior to trial. Appellant has, therefore, failed to demonstrate that counsel's representation fell below an objective standard of reasonableness.

**{¶ 73}** Appellant has also failed to explain how, in light of all of the other evidence introduced at trial, the result of his trial could have been any different had the weapons under disability charges been tried to the court, rather than the jury. There is nothing in the record to indicate that the jury convicted appellant because it was prejudiced against him after learning about his felony drug convictions. Rather, the record demonstrates that the jury was not informed of the details of the offenses. Furthermore, the trial court instructed the jury that the evidence regarding appellant's prior trafficking and possession convictions "was received because a prior conviction of that type of offense is an element of the offenses of Having a Weapon While Under a Disability … as charged in Case 2020-CR-124" and "[i]t was not received, and you may not consider it, to prove the character of the Defendant in order to show he acted in conformity or in accordance with that character." This court presumes that the jury followed those instructions. *See State v. Garner*, 74 Ohio St.3d 49, 59 (1995) (a jury is presumed to follow instructions given it by a trial judge).

28.

## Confrontation Objection

**{¶ 74}** Next, appellant contends that his trial counsel was ineffective for failing to object to testimony by Sergeant Scheerer that Ronald Geffeller told him that Geffeller went to 306 Market Street to purchase narcotics from appellant.

**{¶ 75}** "The 'failure to object to error, alone, is not enough to sustain a claim of ineffective assistance of counsel.'" *State v. Liles*, 2014-Ohio-259, ¶ 49 (3d Dist.), quoting *State v. Johnson*, 2006-Ohio-6404, ¶ 139, citing *State v. Holloway*, 38 Ohio St.3d 239, 244 (1988). "To prevail on such a claim, a defendant must first show that there was a substantial violation of any of defense counsel's essential duties to his client and, second, that he was materially prejudiced by counsel's ineffectiveness." *Holloway* at 244, citing *State v. Lytle*, 48 Ohio St.2d 391, 396-397 (1976) and *Strickland*, 466 U.S. 668 (1984).

**{¶ 76}** As discussed above, "[a]ccused parties have the right to confront witnesses making testimonial statements pursuant to the Confrontation Clause of the Sixth Amendment to the United States Constitution." *See State v. Stevenson*, 2023-Ohio-4853, ¶ 59 (6th Dist.), citing *State v. Ford*. 2019-Ohio-4539, ¶ 214, citing *Crawford,* 541 U.S. 36 at 53-54. "Accordingly, the Sixth Amendment bars testimonial statements made by a declarant not appearing at trial so that an accused may cross-examine that declarant." *Id.* "[I]f the statements were given in response to a police interrogation, i.e., 'knowingly given in response to structured police questioning,' then they are more likely to be testimonial.'" *Id.* at ¶ 64, citing *Crawford* at 53.

29.

{¶ 77} Here, Sergeant Scheerer testified that he had an interaction with Ronald Geffeller on June 19, 2020, at the sheriff's office after he was released from jail. Sergeant Scheerer testified that he talked to Geffeller about why he had been at the Market Street residence with appellant the previous day, and Geffeller stated that he went there to purchase narcotics from appellant.

{¶ 78} Assuming that Geffeller's statement was testimonial and that defense counsel should have objected to Sergeant Scheerer's testimony as violative of the Confrontation Clause, we must still determine whether appellant has demonstrated that he was prejudiced by this alleged failure.

{¶ 79} In this case, Geffeller's phone showed an outgoing call to appellant approximately 30 minutes before Sergeant Scheerer and Detective Sergeant Harvey observed Geffeller with appellant at the Market Street residence. Geffeller's phone also included text messages between Geffeller and appellant setting up a sale of narcotics. While surveilling the residence, Detective Sergeant Harvey observed Geffeller exit a vehicle and enter 306 Market Street through the front door. Shortly thereafter, Geffeller and appellant exited the residence. After taking appellant into custody, Detective Sergeant Harvey searched appellant and found three bundles of money in his pocket totaling $3,099. Detective Sergeant Harvey and Detective Rotuno both testified that, based on their training and experience, the way the money was bundled and the denominations were indicative of drug trafficking. Detective Rotuno further testified that one of the bundles contained $850, which was comparable to the price of two ounces of

30.

narcotics and was consistent with the text messages between appellant and Geffeller. Appellant also provided inconsistent information to law enforcement concerning the source of the money. While appellant was being arrested, Geffeller fled on foot and Sergeant Scheerer chased after him. Sergeant Scheerer testified that he observed Geffeller ripping open a plastic baggie and emptying a white powdery substance. Sergeant Scheerer eventually apprehended Geffeller and recovered the opened plastic baggie as well as another plastic baggie in Geffeller's pants pocket. BCI determined that the white substance in one of those baggies weighed approximately 2.75 grams and included heroin and fentanyl, and that the residue in the other baggie also included heroin and fentanyl. Furthermore, the execution of a search warrant at the 306 Market Street residence resulted in the seizure of utility bills in the name of appellant and Qiana Kaczka, a document from Fireland's Regional Medical Center in appellant's name and listing his phone number, a wallet with appellant's identification card, a digital scale with residue, a bookbag containing money, marijuana paraphernalia, and marijuana roaches. The digital scale with residue and marijuana roaches were found in a bedroom that contained paperwork with appellant's name on it and male clothing in his approximate size. Considering the totality of this evidence, we find that the State presented overwhelming evidence to establish the fourth-degree felony drug trafficking charges in case No. 2021-CR-24. Thus, any error relating to defense counsel's failure to object to Sergeant Scheerer's testimony was harmless.

31.

{¶ 80} Because appellant has failed to show a reasonable probability that, but for counsel's failure to object to Sergeant Scheerer's testimony, the result of the trial would have been different, he is unable to satisfy the prejudice prong of the ineffective-assistance-of-counsel test.

**Merger**

{¶ 81} Appellant also contends that his trial counsel was ineffective for not moving the trial court to merge his convictions for weapons under disability and felony receiving stolen property. This claim is without merit because, as explained below in response to appellant's sixth assignment of error, the weapons under disability and receiving stolen property offenses were of dissimilar import.

{¶ 82} For all of the foregoing reasons, appellant's fourth assignment of error is found not well-taken.

**The trial court erred when it separately sentenced appellant for tampering with evidence and disrupting public services in case No. 2021-CR-94.**

{¶ 83} In his fifth assignment of error, appellant contends that the trial court erred by not merging his convictions for tampering with evidence, disrupting public services, and vandalism in case No. 2021-CR-94.

{¶ 84} "R.C. 2941.25 prohibits multiple convictions for 'allied offenses of similar import' arising from the same conduct." *State v. White*, 2021-Ohio-335, ¶ 8 (6th Dist.). "To determine whether multiple convictions constitute allied offenses, the court must address three questions: (1) did the offenses involve either separate victims or 'separate and identifiable harm, (2) were the offenses committed separately, and (3) were the

32.

offenses committed with separate animus?'" *Id.*, quoting *State v. Ruff,* 2015-Ohio-995, ¶ 25. "'An affirmative answer to any of the above will permit separate convictions.'" *Id.*, quoting *State v. Tellis*, 2020-Ohio-6982, ¶ 74 (6th Dist.).

{¶ 85} Appellant was convicted of tampering with evidence in violation of R.C. 2921.12(A)(1), which provides that "[n]o person, knowing that an official proceeding or investigation is in progress, or is about to be or likely to be instituted, shall … [a]lter, destroy, conceal, or remove any record, document, or thing, with purpose to impair its value or availability as evidence in such proceeding or investigation."

{¶ 86} Appellant was also convicted of vandalism in violation of R.C. 2909.05(B)(1)(b), which provides that "[n]o person shall knowingly cause physical harm to property that is owned or possessed by another, when … [r]egardless of the value of the property or the amount of damage done, the property or its equivalent is necessary in order for its owner or possessor to engage in the owner's or possessor's profession, business, trade, or occupation."

{¶ 87} R.C. 2909.04 (A)(1), disrupting public services, provides that "[n]o person, purposely by any means or knowingly by damaging or tampering with any property, shall" interrupt or impair police service communications."

{¶ 88} Here, the parties agree that the conduct for all three offenses was the same – cutting off the court-ordered ankle monitor – and that the animus for the offenses was the same – to avoid detection by the Erie County Probation Department and the court. The parties also agree that the harm involved for tampering with the evidence and

33.

disrupting public services was the same and, thus, both parties agree those two offenses should have merged at sentencing. Where the parties disagree is with respect to victim identity and whether the harms for the offenses of tampering with evidence and vandalism were the same.

{¶ 89} The State argues that the victims of the tampering with evidence offense were the court and community at large, because by removing the ankle monitor, appellant tampered with evidence that could otherwise be provided to the court and created a heightened safety concern for the community. By contrast, the State argues, the victim of the vandalism offense was Oriana House, which was the entity that performed the monitoring via the ankle monitor that was rendered unusable when appellant cut the strap.

{¶ 90} Appellant argues that Oriana House was "a victim of all three offenses in two ways." First, appellant states, Oriana House is part of the "community at large" victim of each offense. And second, appellant contends that "it is Oriana House Employees who do the monitoring via the ankle monitor that was damaged when appellant cut the strap." Appellant also argues that the vandalism offense has "Oriana House's business practice as an element and excludes economic harm from the calculus." Thus, appellant reasons, "[t]he fact that Oriana House may have endured economic harm does not adequately differentiate it under these facts to allow for separately imposed sentences."

34.

**{¶ 91}** In this case, we are persuaded by the State's argument. Here, we find that the offenses of disrupting public services and tampering with the evidence are allied offenses of similar import because the harms engendered by their commission similarly impacted the public at large (to the extent that they affected the functioning of the criminal justice system and, by extension, the safety of the community) and were not separate and identifiable.

**{¶ 92}** The harm related to the offense of vandalism, on the other hand, specifically and exclusively impacted Oriana House and its ability to conduct business. While Oriana House may well be considered a victim of all three offenses, as appellant suggests, it would be one of many victims of the disrupting public services and tampering offenses, but the only victim of the vandalism offense, and the only victim whose business was directly affected by appellant's actions.

**{¶ 93}** Because we find that the offenses of disrupting public services and tampering with evidence are allied offenses of similar import in this case, appellant's fifth assignment of error is found well-taken in part. We reverse and vacate the two convictions for those two offenses, and remand this case to the trial in order that the State may elect on which charge to proceed.

35.

**The trial court did not err when it separately sentenced appellant for having weapons under disability and felony receiving stolen property.**

{¶ 94} In his sixth assignment of error, appellant contends that the trial court erred by not merging the weapons under disability and felony receiving stolen property offenses in case No. 2020-CR-0124.

{¶ 95} Where, as here, an allied-offense challenge is not properly preserved in the trial court, we review the matter for plain error. *See State v. Bailey*, 2022-Ohio-4407, ¶ 7, citing *State v. Rogers*, 2015-Ohio-2459, ¶ 28. "Under the plain-error doctrine, intervention by a reviewing court is warranted only under exceptional circumstances to prevent injustice." *Id.*, at ¶ 8, citing *State v. Long*, 53 Ohio St.2d 91 (1978), paragraph three of the syllabus.

{¶ 96} Appellant was convicted of four counts of having weapons while under disability, in violation of R.C. 2923.13(A)(3), which prohibits a person who "has been convicted of any felony offense involving the illegal possession, use, sale, administration, distribution, or trafficking in any drug of abuse" from knowingly acquiring, having, carrying, or using any firearm or dangerous ordnance. Appellant was also convicted of four counts of Receiving Stolen Property, in violation of R.C. 2913.51(A), which prohibits a person from "receiv[ing], retain[ing], or dispos[ing] of the property of another [in this case, firearms] knowing or having reasonable cause to believe that the property has been obtained through commission of a theft offense."

{¶ 97} It is undisputed that these offenses were committed through the same conduct, i.e., by appellant taking possession of the firearms and placing them in Sally

36.

Kaczka's closet. Merger was not appropriate, however, because the offenses were of dissimilar import. The victims and harm resulting from having weapons under disability and receiving stolen property were different. Gary Castle was the victim of appellant's receiving stolen property offenses, as he suffered the harm of losing his stolen firearms. That harm was independent from the harm that resulted from appellant's having weapons under disability offenses, which resulted in an increased risk to the community that he would use the firearms. *See State v. Finnell*, 2015-Ohio-4842, ¶ 70-75 (1st Dist.) (finding that having weapons under disability and receiving stolen firearms offenses did not merge because the "harm that resulted from the weapons offense was an increased risk that the weapons would be used by [the defendant]" and "the harm that resulted from the receipt of the stolen property offense involved the legal owner's loss of the firearm).

**{¶ 98}** Arguing against this conclusion, appellant points to *State v. Beverly*, 2013-Ohio-1365 (2d Dist.), wherein the Second District Court of Appeals concluded that because the offenses of having a weapon while under disability and receiving stolen property "were not committed each with a separate animus," the trial court erred in failing to merge them for sentencing purposes. *Id.* at 47. In that case, the court did not conduct any analysis regarding the harm between the two offenses. Accordingly, we find it to be of limited benefit as applied to the facts of this case.

**{¶ 99}** Next, appellant turns our attention to *State v. Skapik*, 2015-Ohio-4404 (2d Dist.). In *Skapik*, the court distinguished *Beverly* and determined that merger of the offenses of having weapons under disability and theft was inappropriate because, under

37.

the facts of that case, there was a separate animus for each charge. As indicated above, that is not the case here. In addition, the court in *Skapik*, like the court in *Beverly,* conducted no analysis regarding the harm between the subject offenses. Thus, like *Beverly*, *Skapik* is of little use in our review of the case at hand.

{¶ 100} Appellant's sixth assignment of error is, therefore, found not well-taken.

**The record in this case does not clearly and convincingly fail to support the trial court's consecutive-sentence findings.**

{¶ 101} In his seventh and final assignment of error, appellant contends that the trial court erred in imposing consecutive sentences that were clearly and convincingly not supported by the record.

{¶ 102} This court reviews felony sentencing challenges under R.C. 2953.08(G)(2). *See State v. Kleinhans*, 2023-Ohio-2621, ¶ 24 (6th Dist.). Pursuant to R.C. 2953.08(G)(2), an appellate court "may increase, reduce, or otherwise modify a sentence that is appealed under this section or may vacate the sentence and remand the matter to the sentencing court for resentencing." *See id.*

{¶ 103} The appellate court may take any action authorized by this division if it clearly and convincingly finds either of the following:

> (a) That the record does not support the sentencing court's findings under division (B) or (D) of section 2929.13, division (B)(2)(e) or (C)(4) of section 2929.14, or division (I) of section 2929.20 of the Revised Code, whichever, if any, is relevant; or

> (b) That the sentence is otherwise contrary to law.

*Id.* at ¶ 25, citing R.C. 2953.08(G)(2).

38.

{¶ 104} Appellant does not dispute that the trial court made the statutory findings required under R.C. 2929.14(C)(4), which permits consecutive sentences as follows:

> (4) If multiple prison terms are imposed on an offender for convictions of multiple offenses, the court may require the offender to serve the prison terms consecutively if the court finds that the consecutive service is necessary to protect the public from future crime or to punish the offender and that consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public, and if the court also finds any of the following:
>
> (a) The offender committed one or more of the multiple offenses while the offender was awaiting trial or sentencing, was under a sanction imposed pursuant to section 2929.16, 2929.17, or 2929.18 of the Revised Code, or was under post-release control for a prior offense.
>
> (b) At least two of the multiple offenses were committed as part of one or more courses of conduct, and the harm caused by two or more of the multiple offenses so committed was so great or unusual that no single prison term for any of the offenses committed as part of any of the courses of conduct adequately reflects the seriousness of the offender's conduct.
>
> (c) The offender's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by the offender.

{¶ 105} In addressing the factors under R.C. 2929.14(C)(4), appellant challenges the weight the trial court attributed to each of the factors rather than the absence of supporting evidence for the trial court's findings. He acknowledges his lengthy criminal history and the fact that "there are aggravating factors connected to his conduct in three

39.

or more of the offenses for which he was being sentenced." He also concedes that the court found him to be without remorse for having committed the offenses for which he was found guilty. But then he points out that none of the offenses for which he was sentence were offenses of violence or sex offenses. He also notes that the "highest felonies involved were third-degree-felony offenses – weapon under disability and tampering with evidence."

{¶ 106} Although appellant agrees that the findings are "supported by this record for at least some consecutive impositions," he also states that "some of the increases [in the length of appellant's sentence] through the consecutive impositions are clearly and convincingly not supported by this record."

{¶ 107} In making his argument, appellant urges this court to conduct a "multi-leveled review of consecutively imposed prison terms for multiple felony offenses," wherein "each time a court aims to enhance the length of the prison sentence through a consecutive imposition, the three findings required by R.C. 2929.14(C)(4) must be evaluated anew to determine whether such an additional increase is clearly and convincingly not supported by the record." Appellant argues that this "recursive approach gives full effect to all the plain language in both R.C. 2929.14(C)(4) and R.C. 2953.08(G)(2)."

{¶ 108} Recently, the Ohio Supreme Court addressed the proper review of consecutive sentences under R.C. 2929.14(C)(4) in *State v. Glover*, 2024-Ohio-5195. The Court reiterated that the trial court must engage in a three-step analysis before imposing a

40.

consecutive sentence under R.C. 2929.14(C)(4). *Id.* at ¶ 38. In addition, the court

addressed the standard for reversing a consecutive sentence, stating,

> Nowhere does the appellate-review statute direct an appellate
> court to consider the defendant's aggregate sentence….

*Id.* at ¶ 43.

{¶ 109} The court further held:

> The statute does not permit an appellate court to simply
> substitute its view of an appropriate sentence for that of the
> trial court. An appellate court's inquiry is limited to a review
> of the trial court's R.C. 2929.14(C) findings. R.C.
> 2953.08(G)(2). Only when the court of appeals concludes that
> the record clearly and convincingly does not support the trial
> court's findings or it clearly and convincingly finds that the
> sentence is contrary to law is it permitted to modify the trial
> court's sentence. *Id.*
>
> …
>
> …. "'[C]lear and convincing evidence' is a degree of proof
> that is greater than a preponderance of the evidence but less
> than the beyond[-]a-reasonable-doubt standard used in
> criminal cases. *State v. Gwynne*, 2023-Ohio-3851, ¶ 14 (lead
> opinion). [Additonal citation omitted.]

*Id.* at ¶ 44, 46. In *Glover,* the court explained that the language of R.C. 2953.08(G)(2)

expresses the General Assembly's intent that appellate courts employ a deferential

standard to the trial court's consecutive-sentence findings and do not simply substitute

their judgment for that of a trial court. *Id.* at ¶ 46.

{¶ 110} Applying the appellate-review statute in this way, we find that the record

in this case does not clearly and convincingly fail to support the trial court's consecutive-

sentence findings. To perform appellant's "multi-leveled review" of his consecutively

41.

imposed prison terms would be outside our role in evaluating whether the trial court's

sentencing findings clearly and convincingly were not supported by the record.

Appellant's seventh assignment of error is, therefore, found not well-taken.

**Conclusion**

{¶ 111} The judgment of the Erie County Court of Common Pleas is affirmed in

part and reversed in part. Because appellant's convictions for disrupting public services

and tampering with evidence are allied offenses of similar import, we reverse and vacate

those convictions, and remand this case to the trial in order that the State may elect on

which charge to proceed. Appellant and appellee are to divide the costs of appeal

pursuant to App.R. 24.

Judgment affirmed, in part, reversed,
in part, vacated, and remanded.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27.
*See also* 6th Dist.Loc.App.R. 4.


Thomas J. Osowik, J.      _____
               JUDGE
Christine E. Mayle, J.

Gene A. Zmuda, J.      _____
CONCUR.              JUDGE

            _____
               JUDGE

This decision is subject to further editing by the Supreme Court of
Ohio's Reporter of Decisions.  Parties interested in viewing the final reported
version are advised to visit the Ohio Supreme Court's web site at:
http://www.supremecourt.ohio.gov/ROD/docs/.