[Cite as *State v. Wells*, 2025-Ohio-578.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
WOOD COUNTY

State of Ohio                                    Court of Appeals No.  WD-23-047

    Appellee                                  Trial Court No. 2022 CR 0535

v.

Tyson Lynn Dale Wells                  **<u>DECISION AND JUDGMENT</u>**

    Appellant                                 Decided: February 21, 2025

* * * * *

Paul A. Dobson, Wood County Prosecuting Attorney, and
David T. Harold, Chief Assistant Prosecuting Attorney, for appellee.

Lawrence A. Gold, for appellant.

* * * * *

**OSOWIK, J.**

{¶ 1} This is an appeal of a June 28, 2023 judgment of the Wood County Court of

Common Pleas, convicting Tyson Wells ("appellant") on one count of aggravated

burglary, in violation of R.C. 2911.11, a felony of the first degree, two counts of felonious

assault, in violation of R.C. 2903.11, felonies of the second degree, and one count of

criminal damaging, in violation of R.C. 2909.06, a misdemeanor of the second degree.

Each of the felonies included a firearm specification.

{¶ 2} On August 24, 2023, appellant was sentenced to a 12-year term of incarceration on count one, two eight-year terms of incarceration on counts two and three, and a 90-day term of incarceration on count four, ordered to be served concurrently with one another, and consecutive to the firearm specification terms, equaling a total a term of incarceration ranging from 14 years to 18 years. For the reasons set forth below, this court affirms the judgment of the trial court.

{¶ 3} Appellant, Tyson Wells, sets forth the following three assignments of error:

"I. The trial court erred in denying appellant's Crim.R. 29 motion.

"II. The jury's verdict was against the manifest weight of the evidence.

"III. The trial court erred by not finding that Counts 1 and 2 were allied offenses of similar import."

{¶ 4} The following undisputed facts are relevant to this appeal. This appeal arises from events occurring on April 26, 2022, at an apartment in Bowling Green. The events center around three individuals; namely, appellant, D.A., the man at whose apartment the events occurred, and T.S., appellant's ex-girlfriend who was staying with D.A. following her break-up with appellant. D.A. and T.S. had become platonic friends while working together at a Whirlpool facility. Underpinning this incident appears to be appellant's impression that the relationship between D.A. and T.S. was more than platonic.

{¶ 5} On April 26, 2022, D.A. and T.S. were both at home inside the Bowling Green apartment. D.A. was asleep on the living room sofa, while T.S. was asleep in the bedroom with the door shut. D.A. was abruptly woken by loud noises in the vicinity of

2.

the open living room window. D.A. went to the window, pulled the blinds aside, saw appellant at the window, and observed that appellant had just broken the window screen and pulled it away from the window, exposing the apartment to entry.

{¶ 6} D.A. next observed appellant throwing rocks from the complex landscaping into the apartment. At this juncture, D.A. observed appellant put his hand and arm through the aperture where the window screen was removed, reach inside the apartment, and brandish a black firearm. D.A. moved his position inside the apartment to avoid being in appellant's line of fire. Subsequently, shots were fired. D.A. grabbed a nearby jack handle and swung it at appellant in an effort to repel the attack. Moments later, D.A. heard a vehicle door slam, he went back to the window, and observed appellant fleeing the scene driving a small pickup truck. Just prior to these events, by his own admission, appellant had slashed the tires on D.A.'s vehicle, which was parked in the apartment complex parking lot.

{¶ 7} During the course of these events, T.S., who had been asleep inside the bedroom, was woken by the commotion. T.S. overheard the shouting voice of appellant, her ex-boyfriend. T.S. immediately called 9-1-1. While on the phone with 9-1-1, T.S. heard the gunshots and reported them to the dispatcher.

{¶ 8} Officers from the Bowling Green Police Department responded to the scene. Upon arrival at the scene, the officers examined and photographed the scene, collected physical evidence for subsequent DNA testing, including the removed window screen, ammunition and bullet casings, and landscape rocks that had been thrown into the

3.

apartment.  They then interviewed D.A. and T.S.  BCI testing subsequently determined that the DNA evidence recovered from the window screen was a match for appellant.

{¶ 9} On December 22, 2022, appellant was indicted on the above-detailed counts of aggravated burglary, felonious assault, and criminal damaging.  On June 26, 2023, a jury trial commenced.

{¶ 10} At trial, appellee presented the testimony of D.A., the victim whose apartment was the location of this incident.  D.A. testified that he knew T.S. for several years through their mutual employer, Whirlpool, and that they had become platonic friends.  D.A. testified that he had also become acquainted with appellant during the course of appellant's prior dating relationship with T.S.  D.A. also conveyed that appellant, "[Had once] come to my house wanting to sell me speakers."

{¶ 11} D.A.'s testimony shifted to the day of the incident.  D.A. explained that T.S. had been staying with him following her breakup with appellant.  On April 26, 2022, D.A. testified that they were both at the apartment, with D.A. asleep on the living room sofa, and T.S. asleep inside the bedroom with the door shut.  D.A. then detailed what occurred next, testifying,

> I woke up to a loud sound that was --- coming from my window.  So I proceeded to get up and come over to it, wondering what was going on. *Once I pulled aside the blinds, that's when I discovered that Tyson Wells was right here in my window and he had busted out my screen * * * The screen was ripped open * * * after that is when I proceeded to notice that he was throwing rocks into my unit, was throwing them at me * * * Then I kept on hearing the words, you thought I was f'ing playing, you thought this was a f'ing game  * * * then I proceeded to notice a gun [come] in through the blinds*.  (Emphasis added).

4.

Appellee then inquired, "[C]ould you see who was holding the gun?" D.A. replied, "Tyson was."

{¶ 12} D.A. continued, testifying, "Then I hear the round --- first round go off, I heard a round go past me. So then I grabbed my handle and started aiming towards the blinds to try to fend him off * * * [T.S.] was in the bedroom * * * with the door closed." Appellee clarified, "[J]ust to be clear, he had entered your apartment, his hand and the gun were inside your apartment?" D.A. replied, "Yes." D.A. next testified that shortly thereafter, "That is when I heard a [vehicle] door close. So I opened the blinds I noticed that [appellant] had gone into a vehicle to take off * * * It was a [small] pickup truck." Appellee inquired, "Did you see Tyson Wells get into the pickup truck?" D.A. replied, "Yes." D.A. then identified his living room t.v. stand in a photograph taken by law enforcement, with a bullet hole visible in the t.v. stand.

{¶ 13} T.S., appellant's ex-girlfriend who was inside D.A.'s apartment at the time of these events next testified. T.S. testified that her romantic relationship with appellant, with whom she had formerly lived, ended the week before this incident. T.S. collaborated and confirmed that her relationship with D.A. was platonic in nature, despite appellant's impression to the contrary.

{¶ 14} T.S. then testified, regarding the night of the incident, "I was sleeping, I heard a noise * * * I thought [D.A.] had tripped over the coffee table by the couch, and so I was getting ready to go back to sleep, until I heard [appellant's] voice, and so I immediately called 9-1-1 * * * I heard commotion, and then heard a pop * * * I was

5.

pretty certain it was a gunshot, because [appellant] had told me previously that he had a gun."

{¶ 15} Connie Naus, another one-time friend of appellant's, next testified to the trial court. Appellee inquired, "Were you guys [Naus and appellant] more than friends?" Naus replied, "A little bit." Naus testified that shortly before the April 26, 2022 incident underlying this case, she had loaned appellant her pickup truck, a small dark green Ford, consistent with the description provided by D.A. to law enforcement of appellant's getaway vehicle. Naus then testified that shortly after this incident, in the course of the police investigation into the incident, she was informed by the investigating officers that her pickup truck had been impounded by law enforcement as evidence in this case, after appellant left it at his brother's home before fleeing the state.

{¶ 16} Appellee next called Detective Matthew Robinson of the Bowling Green Police Department to testify. Robinson testified that, in his 18 years of law enforcement experience, he has participated in hundreds of crime scene investigations. Robinson testified that while on duty on April 26, 2022, he was one of the responding officers in this case. Robinson testified that upon arrival at the scene and investigating the incident, he determined that, "[Appellant] had pulled the screen back on the exterior of the apartment, put his hand inside the apartment, fired off at least one round * * * there was an entry hole from a bullet [in the TV stand]." Robinson then identified and described multiple crime scene photographs that he had taken capturing the bullet hole, the trajectory from which it had been fired, the damaged window screen, and the location in which these events occurred.

6.

{¶ 17} Appellee next called detective Doug Hartman of the Bowling Green Police Department to testify. Hartman testified that in his 30 years of law enforcement experience he has supervised an estimated 1,000 crime scene investigations. Hartman testified that while on duty on April 26, 2022, he was one of the responding officers in this case. Appellee inquired as to Hartman's actions upon arrival at the scene. Hartman testified, "I supervised the collection of evidence, the photographing of the apartment, and spoke with [D.A. and T.S.]." Appellee then inquired, "Where was [appellant] ultimately located at?" Hartman testified,

> In Indianapolis * * * three days after the incident * * * we received a call from Fremont police division indicating Connie Naus's truck was located parked outside of [appellant's] brother's house [after the incident] * * * I coordinated with the detectives from Fremont * * * to impound that vehicle as evidence." Appellee inquired regarding DNA evidence, "[A]fter [appellant] was brought back here, I obtained two buccal swabs for DNA analysis * * * I placed them into evidence to be sent to BCI for analysis. Appellee next called Melissa Zielaskiewicz, the BCI analyst who performed the

testing in this case, to testify. After testifying in detail regarding her background, experience, and the processes and protocols utilized in her work, appellee inquired, "Based on your education, training, experience, and your comparative analysis, were you able to determine, within a reasonable degree of scientific certainty, if the DNA profile * * * was similar to one of the standard you received in this case?" She replied, "*Yes * * * the swab of the [apartment window] screen gave a profile that * * * was consistent with [appellant] * * * we would expect to have to test more than a trillion people to find somebody else with that same DNA profile*." (Emphasis added). Appellee rested.

7.

{¶ 18} Appellant then testified on his own behalf to the trial court. Appellant conceded to the bulk of the events. Appellant testified,

> I went to the apartment complex, I stabbed the tires on [D.A.'s] car, and then went to [D.A.'s] apartment * * * I looked in the window, and I could see him lying on the couch. I hollered in, bitch I'm here, come out, let's fight * * * the [apartment window] screen popped open at the bottom. I grabbed it, pulled it open, and I pushed his arms * * * when I pushed his arms he turned that way and gunfire * * * I left. Got in the car and left.

{¶ 19} While appellant acknowledged the bulk of the events, appellant then, contrary to the evidence, self-servingly attributed the gunfire to D.A. The parties rested and the matter was submitted to the jury. Following jury deliberations, appellant was convicted on all counts. This appeal ensued.

{¶ 20} In the first assignment of error, appellant argues that the trial court erred in denying appellant's Crim.R. 29 motion for acquittal. We do not concur.

{¶ 21} In support of the first assignment of error, appellant summarily maintains, "[N]o credible evidence was introduced by the state that he trespassed in D.A.'s apartment * * * that appellant ever possessed a firearm and stuck his arm inside the window to discharge a round." The record of evidence runs counter to this characterization.

{¶ 22} As this court held in *State v. Stevens*, 2023-Ohio-4683, ¶ 131-132 (6th Dist.),

> Crim.R. 29(A) provides for an entry of a judgment of acquittal if the evidence is insufficient to sustain a conviction. An appellate court reviews the denial of a Crim.R. 29 motion for acquittal using the same standard that is used to review a sufficiency of the evidence claim. *State v. Reyes*, 6th Dist. Wood No. WD-03-059, 2005-Ohio-2100, ¶ 21, citing *State v. Carter*, 72 Ohio St.3d 545, 553, 651 N.E.2d 965 (1995). The Supreme Court of

8.

Ohio has stated that the term 'sufficiency of the evidence' presents a question of law as to whether the evidence is legally adequate to support a jury verdict as to all elements of the crime. *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997). In reviewing a sufficiency of the evidence claim, the relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus. A case is suitable for a jury determination when reasonable minds may reach different conclusions as to the proof of the material elements of a crime. *State v. Bridgeman*, 55 Ohio St.2d 261, 381 N.E.2d 184 (1978).

{¶ 23} Contrary to appellant's position, the record reflects, by the testimony of both D.A. and appellant himself, that on April 26, 2022, upon arriving outside of D.A.'s apartment, appellant slashed D.A.'s tires, pulled off D.A.'s living room window screen, aggressively challenged D.A. to a fight, and then insert his arm and hand through the open window and into the apartment. T.S. overheard these events, recognized appellant's voice, and called 9-1-1. In conjunction, D.A. directly testified observing appellant brandish a black firearm after thrusting his arm and hand into the apartment, and then fire several shots into the apartment. The investigating law enforcement officers recovered bullets and casings at the scene, photographed the bullet hole damage in the living room t.v. stand, and photographed and testified in detail regarding the trajectory of the bullet matching appellant's location at the window when the shots were fired. Appellant's post-hoc claim that D.A. was the one who fired a gun has no basis in the record of evidence.

{¶ 24} We find that, when viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could have found the elements of the crimes proven beyond a reasonable doubt. Accordingly, we find that the trial court did not err in

9.

denying appellant's Crim.R. 29 motion for acquittal. Appellant's first assignment of error is found not well-taken.

{¶ 25} In the second assignment of error, appellant argues that the jury verdict was against the manifest weight of the evidence. In support, appellant conjectures that, "The jury did not fully consider all the evidence * * * and appellant * * * in the jury's view, was unable to get past his rejection and showed up at D.A.'s apartment looking to cause trouble * * * The only evidence presented by the state in this matter was the testimony of D.A. and appellant's DNA on a portion of the window screen." Devoid of evidence, appellant further conjectures that, "D.A. * * * produced a firearm, which was discharged inside of the apartment by D.A."

{¶ 26} As held by this court in *State v. Costilla*, 2024-Ohio-3221, ¶ 46 (6th Dist.),

> The test of manifest weight of the evidence * * * applies to the prosecution's burden of persuasion. *Messenger* at ¶ 26. A challenge to a conviction based on the manifest weight of the evidence questions whether the trial court could find a greater amount of credible evidence was admitted at trial to sustain that decision than not. *Manning* at ¶ 41, citing *State v. Montgomery*, 148 Ohio St.3d 347, 2016-Ohio-5847, 71 N.E.3d 180, ¶ 75, citing *Thompkins* at 387, 678 N.E.2d 541. *In reviewing a verdict against the manifest weight of the evidence, we give deference to the trial court's credibility determinations if the testimony of a single witness, if believed, will support a conviction. Manning* at ¶ 41-41, citing *Meyers*, 2018-Ohio-1903, 114 N.E.3d 1138, ¶ 140-141. (Emphasis added).

{¶ 27} In support of this assignment, appellant cites to the allegedly unduly heavy reliance of the trial court on the testimony of D.A. in reaching the verdict adverse to appellant. Such a position fails to recognize the considerable additional evidence against appellant, including the collaborating testimony of T.S., who was present inside the apartment during these events, and the testimony of numerous investigating law

10.

enforcement officers from both the Bowling Green Police Department and BCI, all of which collaborated and bolstered D.A. and T.S.'s testimony regarding appellant's actions. In conjunction, as held by this court in *Costilla*, "[T]he testimony of a single witness, if believed, will support a conviction." Thus, the purported undue reliance on D.A.'s testimony cannot constitute the basis of a meritorious manifest weight argument in this case. Even if the sole basis of the verdict was the testimony of D.A., that is a permissible basis of the disputed verdict.

{¶ 28} We find that the record contains evidence from which the trial court could find that a greater amount of credible evidence was admitted at trial to sustain the decision than not. Accordingly, appellant's second assignment of error is found not well-taken.

{¶ 29} In appellant's third assignment of error, appellant argues that the trial court erred in not merging the aggravated burglary conviction in count one with the felonious assault conviction in count two, as allied offenses of similar import for sentencing purposes.

{¶ 30} In support of the third assignment of error, appellant specifically sets forth a conclusory claim that, "Appellant states that Count 1 and 2, aggravated burglary and felonious assault, strictly pertained to D.A. * * * Appellant's conduct was not separate and identifiable."

{¶ 31} Appellant seemingly suggests, devoid of supporting legal authority, that having the same victim in both counts should be construed as precluding the offenses from nevertheless being found to be "separate and identifiable."

11.

**{¶ 32}** As held by this court in *State v. Scott*, 2024-Ohio-5849, ¶ 84 (6th Dist.),

R.C. 2941.25 prohibits multiple convictions for allied offenses of similar import arising from the same conduct. *State v. White*, 2021-Ohio-335, ¶ 8 (6th Dist.). 'To determine whether multiple convictions constitute allied offenses, the court must address three questions: (1) did the offenses involve either separate victims or separate and identifiable harm, (2) were the offenses committed separately, and (3) were the offenses committed with separate animus?' *Id*., quoting *State v. Ruff*, 2015-Ohio-995, ¶ 25. An affirmative answer to any of the above will permit separate convictions. *Id*., quoting *State v. Tellis*, 2020-Ohio-6982, ¶ 74 (6th Dist.).

**{¶ 33}** As relates to the aggravated burglary conviction, R.C. 2911.11(A)(2) establishes, in relevant part, "No person, by force * * * shall trespass in an occupied structure * * * with purpose to commit in the structure * * * any criminal offense, if * * * the offender has a deadly weapon or dangerous ordinance on or about the offender's person or under the offender's control."

**{¶ 34}** As relates to the felonious assault conviction, R.C. 2903.11(A)(2) establishes, in relevant part, "No person shall knowingly * * * cause or attempt to cause physical harm to another or to another's unborn by means of a deadly weapon or dangerous ordinance."

**{¶ 35}** In *State v. Pugh*, 2022-Ohio-3038, ¶ 25 (8th Dist.), an analogous case in which the trial court's decision to not merge aggravated burglary and felonious assault convictions as allied offenses of similar import was also challenged, the court held,

Testimony was presented that Pugh completed the burglary upon entry and then separately committed the felonious assault * * * Once P.G. entered the apartment with a purpose to commit a criminal offense, he had the choice to leave without committing the second offense * * * *the harm caused between the burglary and the [felonious assault] was distinct. K.M. had her home invaded, a form of harm distinct from being shot at*. (Emphasis added).

12.

{¶ 36} The record in this case reflects analogous fundamental facts. The record shows that the trial testimony of D.A. stated, "I proceeded to notice a gun came in through the blinds." Appellee inquired, "[C]ould you see who was holding the gun?" D.A. replied, "Tyson was." Appellee then inquired, "Did * * * [appellant's] hand actually enter your apartment?" D.A. replied, "Yes. Once I had noticed the gun I proceeded to step to the side, pulled my body to the side, [in order] to [be] less of a target to be aimed at." D.A. next testified that subsequently, "I hear the round --- first round go off, I heard a round go past me."

{¶ 37} As was likewise the case in *Pugh*, D.A.'s trial testimony reflects that while the victim in both offenses was the same, the harm was nevertheless separate and identifiable, and the offenses were committed separately. The record shows that appellant first physically breached into the interior of D.A.'s apartment, through the window, thrusting his hand and arm inside, brandishing a firearm. In response, D.A. relocated to a different position in the room in an effort to protect himself from being a target of appellant. Following D.A.'s relocation, appellant then fired his weapon into the room. We find that this sequence of events evinces separate and identifiable harm, committed separately, in succession to one another. D.A.'s home was first invaded, then he was subsequently, separately, shot at.

{¶ 38} Accordingly, in accord with *Ruff* and *Pugh*, these offenses did not constitute allied offenses of similar import. Thus, we find appellant's third assignment of error not well-taken.

13.

**{¶ 39}** On consideration whereof, the judgment of the Wood County Court of Common Pleas is hereby affirmed. Appellant is ordered to pay the costs of this appeal pursuant to App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Thomas J. Osowik, J.            _____

                                           JUDGE

Gene A. Zmuda, J.

                                        _____

Charles E. Sulek, P.J.                           JUDGE
CONCUR.

                                        _____

                                           JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions. Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at:
http://www.supremecourt.ohio.gov/ROD/docs/.